The CENTRAL FOUNDRY COMPANY, Robert L. Hamill, Fred J. Young and Paul M. Dollard, individually and as the Management Proxy Committee of The Central Foundry Company, Plaintiffs,

v.

Sidney GONDELMAN, Harold D. Farber, Alan H. Knowles, John J. Nolan, Jr., William C. Maidman, Arthur R. Roy, Sr., and Jacob I. Rosenbaum, Individually and as Members of The Central Foundry Company Independent Stockholders' Protective Committee, and The Central Foundry Company Independent Stockholders' Protective Committee, Defendants.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Sidney GONDELMAN, Harold D. Farber, Alan H. Knowles, John J. Nolan, Jr., William C. Maidman, Arthur R. Roy, Sr., and Jacob I. Rosenbaum, Individually and as Members of The Central Foundry Company Independent Stockholders' Protective Committee, and The Central Foundry Company, a Corporation, Defendants.

United States District Court
S. D. New York.
Aug. 15, 1958.

Guggenheimer & Untermyer, New York City, Harry Hoffman, Alfred Berman, Leon H. Tykulsker, New York City, of counsel, for plaintiff Central Foundry Co.

Royall, Koegel, Harris & Caskey, New York City, John A. Wells, William R. Glendon, Thomas H. McBryde, New York City, of counsel, for defendants Central Foundry Co., Independent Stockholders' Protective Committee and Sidney Gondelman.

Daniel J. McCauley, Jr., Washington, D. C., J. Gordon Cooney, New York City,

of counsel, for Securities & Exchange Commission.

BICKS, District Judge.

The Central Foundry Company, a Maine corporation, (hereinafter referred to as the "Company"), whose voting securities (with the relatively insignificant exception hereinafter noted) are listed and registered on the New York Stock Exchange, a national securities exchange, is enmeshed in a contest for control. Each of its oustanding 642,635 shares of stock is entitled to one vote, 639,130 thereof are common and the remaining 3,505, not listed or registered on any national securities exchange, are preferred. The former were held on April 14, 1958, the record date for the 1958 annual meeting of stockholders by 3,410 [1] individuals and 153 brokers.[2]

The contestants are the present members of the Board of Directors [3] a majority of whom have served the Company in that capacity for upwards of 20 years and an insurgent group self-denominated "The Central Foundry Company Independent Stockholders' Protective Committee" (hereinafter referred to as the "Committee") formed by Sidney Gondelman,[4] and to whom every one of the Committee's slate of candidates for director owes his nomination.[5] He has individu-

1. 1,729, or slightly upwards of 50%, of the total number of individual holders held as of the record date 50 shares or less and an additional 1,146 individuals, or slightly upwards of 33⅓% of the total number of individual holders held between 51 and 100 shares.

The common stock closed on April 14, 1958, at 9¾.

The geographic distribution of all the stockholders, that is both individuals and brokers and holders of common and holders of preferred stock, was 2,467 in the area covered by the North Atlantic States and 1,189 in more distant states and foreign countries.

2. 50 or less shares of common stock were registered in the names of 19 brokers; between 51 and 100 shares in the names of 21 brokers; between 101 and 500 in the names of 44 brokers; between 501 and 1,000 in the names of 25 brokers; between 1,001 to 5,000 in the names of 37 brokers; and upwards of 5,000 in the names of 7 brokers.

The stock standing in the names of brokers is held for approximately 1,500 beneficial owners.

3. The management slate consists of the present members of the Board of Directors with the exception of John J. Nolan, Jr., who after serving as director since 1943 and as President since 1952, failed of reelection to the office of president at the meeting of the Board of Directors held next succeeding the 1957 annual meeting of stockholders. He has allied himself with the insurgent group. Quoting from the Schedule 14 B filed by Mr. Nolan with the Securities & Exchange Commission, "I became a participant * * * in the solicitation of proxies on behalf of the * * * in-surgent group at the request of Mr. Sidney Gondelman, a leading member * * * thereof * * *. Mr. Sidney Gondelman has advised me that he expects to nominate me for election to the * * * board of directors * * * and to recommend to the board of directors * * * that I be elected an officer * * *."

4. Mr. Gondelman testified: "I formed the committee originally * * *. It was a one man committee."

In Schedule 14 B filed on behalf of the Committee with the Securities & Exchange Commission on February 3, 1958, Mr. Gondelman stated: "This Committee became a participant upon its formation on January 22, 1958, by Mr. Sidney Gondelman its sole member to date."

In the Schedule 14 B filed on behalf of himself he stated: "I have formed such a committee but, at this time, am the sole member thereof. I have taken the sole initiative thus far in organizing, directing and financing the preparations for the organization of the Committee."

5. Mr. Gondelman testified:

"Q. And this was a board of directors, a slate of prospective directors, every one of which had been nominated by you, isn't that so? A. Yes."

In the Schedule 14 B filed by him on February 3, 1958, he stated: "(c) Neither I nor any of my associates has any arrangement or understanding with any person with respect to any future transactions to which the issuer or any of its affiliates will or may be a party, except as follows: (1) I have advised Messrs. Harold D. Farber, Herbert L. Grayson, Fred Korros, William Maidman, J. J. Nolan, Jr., Jacob I. Rosenbaum and Arthur R. Roy, Jr., that I will nominate

ally borne and paid all the expenses of the Committee—to May 10, 1958, about $30,-000 and proposes to continue to be the exclusive source of its funds without any understanding or agreement whatsoever that he will ultimately be reimbursed for a proportionate share or any share thereof from any of the other members of the group.[6]

In soliciting proxies to be used at the annual meeting both sides have used the mails and other means or instrumentalities of interstate commerce.

The Securities Exchange Act of 1934 provides:

> "It shall be unlawful for any person, by the use of the mails or by means or instrumentality of interstate commerce * * * to solicit or to permit the use of his name to solicit any proxy * * * in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Section 14(a) of the Act, 15 U.S.C.A. Section 78n.

Consistent with the authority thus conferred, the Securities & Exchange Commission duly promulgated Regulation X–

them for election to the board of directors. (2) I have advised Mr. J. J. Nolan, Jr., that I will recommend to the board of directors elected at next annual stockholders' meeting that he be elected as an officer of the company."

On February 6, 1958, he filed a second amendment to his Schedule 14 B the effect of which was to eliminate Fred Korros from among those whom he had advised he would nominate for election as director, and on April 10, 1958, he filed a third amendment thereto which in part further changed his slate of nominees by eliminating therefrom Herbert L. Grayson, his son, and adding himself and Alan H. Knowles.

Rule 14 a–11 (b) defines any nominee for whose election as a director proxies are solicited as a "participant in a solicitation" and as such is required to file "a statement * * * containing the information specified by Schedule 14 B." Rule 14 a–11 (c). The statements filed by William Maidman, Harold Farber, Arthur R. Roy, Sr. and John J. Nolan, Jr., each recite in part:

"I became a participant in the solicitation * * * upon joining the Central Foundry Company Independent Stockholders' Protective Committee as a member thereof, at the request of Mr. Sidney Gondelman a leading member of the Committee.

* * * * * * *

"* * * Mr. Sidney Gondelman has advised me that he intends to nominate me for election to the board of directors * * * at the annual meeting of stockholders to be held in May 1958."

The statements filed by Knowles and Rosenbaum are for all purposes here material substantially the same in the foregoing respects as those filed by the other individuals Gondelman advised he intended to nominate for election to the board of directors.

The Nolan statement contains an additional recital with respect to his election as an officer. See note 3, supra.

6. Mr. Gondelman testified as follows:

"Q. Did any agreement exist between you and any other members of the committee as to bearing the cost of this solicitation? A. They know that they have got to pay something—

"Q. No. Does any agreement exist between you and any of the other members of the committee—A. No definite agreement.

"Q. But you did not feel that you should disclose to the stockholders in this letter of April 4th that you were the sole provider of the funds of the committee up to that time and that you proposed to be thereafter? A. That never gave me any thought. I paid the expenses and I asked for some of the expenses from some of the members of the committee. They didn't have it, so I laid out the money myself. That's all.

"Q. But is there any understanding that you will ultimately be reimbursed for any proportionate share or any share of the amounts that you lay out? A. Judge, there is no definite understanding. I asked one or two members of the committee, 'How about some money?' and they said, 'Why do you need it? Go ahead and lay it out. You will get it afterwards.'

"Q. Maybe I don't make myself clear. It isn't a question of time of payment, but does any agreement exist? A. No, none whatsoever.

"Q. Written or oral? A. If they don't give it to me, they won't give it to me. If I have to lose it, I will lose it myself."

14 (17 C.F.R. 240.14a), referred to as the proxy rules. The proxy rules provide in part:

"No solicitation * * * shall be made by means of any proxy statement * * * or other communication, written or oral, containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting which has become false or misleading." Rule X-14 a-9, 17 C.F.R. 240.14 a-9.

The contest from the beginning has in large part been a personality fight. As viewed by the Management and urged by them upon the stockholders "the real issue is whether you want to continue in office your present management, or whether you want to entrust your investment in the company to Mr. Sidney Gondelman and his associates." The Committee on the other hand presented to the stockholders as "the real issue of the proxy contest: (1) The stockholders' committee wants John J. Nolan, Jr. back as President! (2) Should directors be large stockholders?"

In urging upon the stockholders that it was not in their interest to entrust the management of the affairs of their company to a Board of Directors comprised of Sidney Gondelman and six individuals who owed their election to him, Management communicated to the stockholders that Mr. Gondelman had been twice disbarred by the courts of New York from practicing as an attorney-at-law because of improper conduct. On the occasion of his first disbarment which occurred in 1929 the Appellate Division of the Supreme Court of the State of New York for the Second Judicial Department, stated in part:

"Respondent [Gondelman] tried one or two cases in the Supreme Court, and really was a trader in negligence cases. His position before Mr. Justice Faber shows respondent to be unreliable and possessed of a wreckless disregard of truth. * * * His methods of practice in violation of law (Penal Law, § 274, subd. 2) and the ethics of the bar, false testimony and concealment of his true financial affairs before Mr. Justice Faber, and his endeavors otherwise to thwart the investigation before that Justice, require that he be disbarred." Matter of Gondelman, 2d Dept.1929, 225 App.Div. 462, 233 N.Y.S. 343, 347.

Gondelman made an application for reinstatement in the latter part of 1930 which was denied. In the middle of 1932 he instituted a further proceeding for reinstatement. The court granted the second application without opinion. 2d Dept.1932, 236 App.Div. 704, 257 N.Y.S. 1061.

After being thus reinstated he was again disbarred in 1940—this time for subornation of perjury. The Court in its opinion stated:

"There were facts and circumstances which, coupled with respondent's failure to produce important documents to sustain his claim justified the official referee in his decision that Mazzola, as a material witness at the Supreme Court Trial, was the creation of respondent. The learned Official Referee has had extensive and various experience as lawyer and Justice of the Supreme Court at Trial Term and in the Appellate Division. He has had the opportunity of observing the witnesses and determining the value of their testimony. His views are entitled to serious consideration.[7]

---

7. The official referee referred to by the Court was the late Mr. Justice Kapper.

After careful reading and analysis of this record the court is constrained to confirm the recommendation of the Official Referee and to direct that respondent be disbarred." Matter of Gondelman, 2d Dept. 1940, 258 App.Div. 1085, 18 N.Y.S.2d 52, 53.

The preliminary draft of Management's first proposed letter to stockholders was delivered to the Securities & Exchange Commission on February 24, 1958. More than the usual time elapsed before the Commission made its final comments thereon, due undoubtedly to the serious import of the information contained therein. Pursuant to an order of the Commission to conduct a private investigation, Sidney Gondelman was examined on February 28, 1958, by Mr. Harry Heller, Assistant Director, Division of Corporation Finance. Relying on the information supplied by Mr. Gondelman, the Commission informed Management that if reference to Gondelman's 1940 disbarment was to be retained in its proxy material it would require Management to include the following statement:

"The Company has been informed that since 1954 proceedings have been held on Mr. Gondelman's application for exoneration with respect to the 1940 disbarment, that pursuant to recommendation of a referee the Court ordered a new hearing on the basis of which a referee has reported that in his opinion it must be held that newly discovered evidence should absolve Mr. Gondelman for blame for the charges upon which he was disbarred in 1940, and that the matter is presently pending before the Appellate Division." [8]

At the insistence of the Commission, Management was obliged to and did incorporate said statement in its letter to stockholders dated April 10, the first one dealing with Gondelman's disbarments.

Obviously if an official referee appointed by the Appellate Division of the Supreme Court reported that in his opinion it must be held that newly discovered evidence should absolve Gondelman for blame for the charges upon which he was disbarred in 1940, the thrust of the 1940 disbarment and the charge of subornation of perjury upon which it was predicated was measurably diluted as a reflection upon Gondelman's character and background. The further statement "that the matter is presently pending before the Appellate Division" did not diminish the ameliorating effect of what preceded.

Quite understandably the Committee was not disposed to treat with Gondelman's disbarment any more than the circumstances compelled.[9]

In a letter over Gondelman's signature dated April 16, 1958, to the stockholders, he expressed a trust in their fairness and stated that the present posture of his efforts to obtain exoneration was accurately stated in Management's letter of April 10, and further, that a fairly lengthy statement in pamphlet form concerning his disbarments and subsequent reinstatement proceedings is being prepared and a copy will be sent upon written, telegraphic or collect telephonic communication.

Again in the so-called "flyer" of which more will be said shortly, the Committee stated that Management had correctly informed the stockholders that

"these proceedings [referring to the so-called exoneration proceedings relating to the 1940 disbarment]

8. At the time the Commission insisted that said statement be made by Management it did not know of the existence of the supplemental report, discussed infra.

9. "Mr. Wells: I am going to hand up a complete set of the material distributed to the stockholders by both sides in this campaign.
"So far as the committee was concerned, we paid very little attention to the disbarment proceeding." (p. 119, May 10, 1958 hearing.) See also briefing of Committee's proxy solicitors, infra.

were pending before the Appellate Division, after two Official Referees of that Court had reported that substantial newly discovered evidence required that Mr. Gondelman be absolved from blame from the charges which led to his disbarment in 1940."

The "flyer" bears no date and was enclosed with a letter to stockholders, also undated, captioned "Do Stockholders Want Personal Attacks or Constructive Programs for the Company?" This loose "flyer" but for the words "Important Information" appearing at the top thereof is in type smaller and less arresting or attention provoking than the bulk of the letter with which it was enclosed. The last three sentences thereof set forth information which in the context of this case was highly significant. After weeks of extensive oral and written communications with stockholders, they are informed well nigh at the end of the campaign and almost upon the eve of the meeting, for the first time that the so-called reinstatement or exoneration proceedings were withdrawn on April 22, 1958.[10] The omission to disclose that fact to the stockholders prior to May 7 made the statements in the earlier communications that the exoneration proceedings were pending before the Court, false and misleading.[11]

10. Both Gondelman and his attorney in the "exoneration" proceeding testified that Gondelman had instructed the latter to withdraw the proceeding on April 19, 1958.

11. Gondelman is represented in the instant proceedings by counsel other than the one who appeared for him in the "exoneration" proceeding.

Judge O'Neill, who was counsel in the latter proceeding, testified in part as follows:

"The Court: The impression conveyed by that brief [the one submitted by Judge O'Neill in support of Gondelman's application for exoneration] was that there was a pending proceeding sub judice awaiting determination by the Appellate Division, and that there was a prospect or a hope, at any rate, that it might result in exoneration.

"But then came the time when a letter was addressed to the Appellate Division withdrawing that petition.

"Don't you think that the failure to communicate that fact to the Commission misled them into believing that that proceeding was still a pending proceeding?

"The Witness: But, sir, it never occurred to me that there had been a failure to communicate—

"The Court: You didn't communicate it, did you?

"The Witness: No. Certainly not, sir.

"The Court: But you expected that Mr. Gondelman would, didn't you?

"The Witness: Or Mr. Wells.

"The Court: How could Mr. Wells have communicated it?

"The Witness: Well, I did not know who was doing what about anything.

"The Court: And that brief communicated certain information, certain intelligence, certain impressions, which, without the fact that the proceeding had been withdrawn, left a false and misleading impression, didn't it?

"The Witness: It sounds like it now, but frankly it never occurred to me, sir.

"The Court: Of course, you did not intend it, but isn't that the result?

"The Witness: I don't know. I would have to think about it, because I will tell you frankly, I am stunned by what you are telling me. I had never given it any thought.

"The Court: There is no suggestion that you did anything wilfully, but the fact of your not doing it did result in misleading—

"The Witness: It upsets me very much. Frankly, I had never thought of it.

"The Court: There is no intimation that you had done it that way for any purpose, but isn't that the effect?

"The Witness: I suppose so. I suppose now, looking at it with hindsight, I should have written a letter to the SEC, and I should have called up Mr. Wells and said, 'Do you know about this?' All I can say is that it never occurred to me to do either.

"The Court: And the SEC did not know from you, any way, and Mr. Wells did not know from you?

"The Witness: That's right, sir, and I very much regret it.

"The Court: And you are the one who addressed the communication to the Appellate Division and the attorney of record?

"The Witness: That's right. That's right."

Immediately following the foregoing disclosure the "flyer" goes on to state:

"Mr. Gondelman had no suggestion from anyone connected with the Court or otherwise and no indication direct or indirect as to what the decision would be and of course did not withdraw the motion because of any concern over the outcome. The reasons he withdrew the motion are the unfavorable comments indulged in recently by management, which cast aspersions upon him and which resulted in unfavorable publicity quite harmful to his family."

Counsel appearing for Gondelman and the committee was first advised of the withdrawal of the exoneration proceedings on May 5 [12] and immediately communicated that intelligence to the Commission. It was then incorporated in the "flyer".

On May 8, 1958, promptly after learning of this unanticipated development, the Company and the Management Proxy Committee of the Company instituted suit against the members of the insurgent group individually and as members of the Committee to enjoin them against voting any of the proxies they had obtained and simultaneously brought on an application by order to show cause for a temporary restraining order. The complaint and the moving papers allege that the Committee in its proxy solicitation had violated the proxy rules of the Commission in numerous respects. Since the annual meeting was scheduled to be held on May 13, a hearing on the application for relief *pendente lite* was set for Saturday May 10. After hearing argument throughout almost the entire day this court dictated its decision on the record, to wit: that (i) the holding of the annual meeting be adjourned to June 2, (ii) Gondelman submit to examination—to commence promptly and continue until

terminated—confined to the truth or falsity of the statements contained in the second paragraph of the "flyer", the circumstances of the withdrawal and the reasons for the delay in advising stockholders thereof, and (iii) neither side shall continue with proxy solicitation of any kind until further order of the Court.

Still another "surprise" came to light —this one on the very day the stockholders meeting, but for the Court's restraining order would have been held. Counsel for Gondelman and the committee in this proceeding, examining Judge O'Neill with respect to a telephone conversation on May 5, 1958, put the following questions to him and received the following answers:

"Q. And what did I ask you? A. You asked me, What about this withdrawal of Gondelman's reinstatement application?

"Q. I asked you whether it had been done, didn't I? A. Yes.

"Q. And I told you, did I not, that I had just learned it a few minutes before? A. You did.

"Q. And I couldn't believe it? A. Yes."

Later during the week of May 5, Judge O'Neill at the request of the Committee's counsel agreed to come to New York City for a conference on May 12. With respect thereto Judge O'Neill testified:

"Q. And how long did that conference go on, Judge O'Neill? A. Several hours.

"Q. And did you happen to mention the Adel supplemental report during the course of that conference? A. Yes.

"Q. And did we ask you whether it had materially changed the position taken by Judge Adel in the original report? A. Yes.

12. Mr. Gondelman testified that he did not inform his counsel in this suit of the withdrawal of the reinstatement or exoneration proceedings until May 5th and then:

"Q. Why was that, Mr. Gondelman? A. I didn't think it was—I didn't think it was an important issue here. I didn't think the issue was my disbarments."

**436**

* * * * * *
"Q. What did you tell us, sir?

A. I said, no." [13]

When Committee counsel was told of the Supplemental Report "They blinked. They said, Supplemental report— what?", and requested a copy. It was received Tuesday, May 13th. Judge O'Neill was phoned on the same day and asked whether he could go down to Washington and confer with the Commission on the following day. He agreed and while there was examined under oath before members of the Staff of the Commission. The transcript of that testimony discloses the following colloquy between Mr. Heller of the Commission and Gondelman's counsel:

"Mr. Heller: Does the report [the Supplemental Report] derogate from his original report?

"Mr. Wells: Judge O'Neill thinks not but it might and for that reason we wanted to bring you a copy and to have you have an opportunity to talk to Judge O'Neill about it and also Mr. Gondelman, if you wish.

"Mr. Heller: May I see the report?

"Mr. Wells: Surely.

"Mr. Heller: Oh, brother."

In the course of that examination Judge O'Neill characterized the reports of Mr. Justice Adel as "weasel reports" * * * "what he says in his supplemental report is to my mind a fantastic thing." He thrice expressed the opinion that the two reports made by Judge Adel, combined, exonerated Mr. Gondelman.

Interrogated as to whether he informed his client at any time of the contents of Judge Adel's first report, he responded:

"I informed him of the first report that Judge Adel had held, he said that he ought to be exonerated but he didn't make a recommendation."

and then with respect to the supplemental report:

"I informed him that Judge Adel said that everything that came from Diggins had to be treated with suspicion but he didn't make any recommendation, that is all."

When the Commission insisted that management include in its proxy material the statement set out in the text at note 8, supra, it had before it Gondelman's testimony which viewed against the facts which subsequently came to light clearly and unmistakably reflects knowledge on his part that Judge Adel had handed down two reports.

In Judge Adel's first report, which bears date January 14, 1957, he stated:

"I have been hesitant to make the conclusion which I have arrived at as stated in the preceding paragraph, recognizing that this respondent from the time that he was disbarred the first time has followed what I believe is the wearing down technique so frequently invoked. Yet, with some reluctance I have come to the conclusion that with all of the evidence in the case now before this Court it must be held that the respondent should be absolved from blame on the charge presented."

In the second or supplemental report dated November 26, 1957, Judge Adel wrote:

"In writing the original report when the matter was first referred to me * * * I concluded that if all of this had been before the Referee who heard the matter in the first instance and this Court when the matter of the report of Referee Kapper came before it, the conclu-

13. No one else, it would appear, seems to be of the same persuasion. Counsel for the Bar Association in his testimony stated that there is no question that in the Supplemental Report, Judge Adel

withdrew the recommendation he had made in his first report and indeed that nobody could reasonably raise that doubt. The reports themselves are clear on this score.

sion would have been other than that arrived at in 1940.

"In the light of the new and additional proof (the testimony of the son of Diggins) should the recommendation be changed?

"The following reasoning sustains the thought that the recommendation should be changed.

\* \* \* \* \* \*

"In the light of the proceedings, I neither adhere to the recommendation originally made, nor do I make a new recommendation but respectfully submit this report choosing, with the permission of the Court, to make no recommendation. This I do with the thought that I am unable to satisfy myself that upon the entire record the failure to produce the exhibit cannot be deemed to be due to the conduct on the part of the respondent. On the other hand, however, the witness Diggins, Sr., has been so thoroughly discredited that even his writings must be received with suspicion."

Neither the Commission, nor Gondelman's counsel, when at the investigation before the Commission on February 28, 1958, knew that Judge Adel had made two reports.

After testifying that Judge Adel handed down his report and that it was public, he was asked:

"Q. Do you have a copy of it?
A. It was in November 1957."

Gondelman finished his exposition with "He [Judge Adel] then said that reluc-

14. Gondelman testifying:
"Q. Did you have any trouble obtaining access to the report, Mr. Gondelman? A. No."

15. "The Court: And you went there [the office of the Clerk of the Appellate Division] for that purpose.
"The Witness: To my best recollection, yes, and no other purpose.
"The Court: And it [the report of Judge Hooley] was made available to you?
"The Witness: It was made available. The Clerk took out the report and showed it to me.

tantly he must find that the charges against me have not been proven."

Contrary to the testimony of Gondelman all papers, records and documents relating to pending disbarment proceedings are sealed and confidential and may not be divulged, except upon prior application to the Appellate Division of the Supreme Court on good cause shown (New York State Judiciary Law, § 90, subd. 10). Gondelman volunteered information contained in the first report in such detail that the Court is satisfied that if it never was in physical possession or if he never read it in its entirety, he knew a good deal more about its contents than Judge O'Neill testified he had communicated to him.

As the party involved, Gondelman had the right of access to all the reports, if not directly at the office of the Clerk of the Court, certainly through his attorney in that proceeding. Apparently "years ago" when he wanted to read Judge Hooley's report the Clerk of the Court made it available to him.[14] He testified that he never presented himself to the Clerk's office to read Judge Adel's supplemental report.[15] After testifying as already noted the following questions were put to Gondelman and he made the indicated responses:

"Q. Wait a minute. I don't understand. Judge Adel rendered a report in which he said the charges against you have not been proven? A. Yes, in the *last report*. [Emphasis supplied.]

"The Court: And you had the opportunity to read it?
"The Witness: And I had the opportunity to read Judge Hooley's report. I remember, I tried to get it from Judge O'Neill at that time, and I couldn't get it.

"Q. But you didn't request the right to read the Adel supplemental report? A. I wasn't in the Appellate Division from that day on. I didn't go to the Appellate Division until the day that that motion was argued, on February 3rd. From that day on, I didn't see anybody. I was not near anybody."

"Q. What does he recommend? A. I will give it to you in a minute. He said that the charges against me have not been sustained, but he begs the Appellate Division not to ask him for a recommendation. He refuses to make a recommendation and he leaves it to the Appellate Division.

"By Mr. Schneider [of the Commission Staff]: Q. Does he say why he didn't make a recommendation?

"By Mr. Heller: Q. What does he say? Let's get that into the record. A. Here is his language: 'Yet with some reluctance I have come to the conclusion that all of the evidence in the case now before this Court it must be held that the respondent should be absolved from the blame on the charge presented.'

"Q. Could I have a copy of that, by the way, right now? A. You can have the brief, if you want it.

"Q. This is only quoted in the brief? A. This is only reported in the brief.

"Q. You don't have the report? A. No, I don't.

"Q. Could you get those reports for me very soon?

"Mr. Wells: Surely.

\* \* \* \* \* \*

"Mr. Wells: We will give you the complete file. It will take quite a while to locate it and tie it all together.

"Mr. Heller: I want particularly the report of Judge Adel for my own purposes as soon as possible. You don't object to having these put in evidence?

"Mr. Wells. Not at all."

On March 5, 1958, Judge O'Neill addressed a communication to Mr. Harry Heller of the Commission stating in part as follows:

"Mr. Sidney Gondelman has asked me to send you my copy of *the* [emphasis supplied] report of Mr. Justice Adel, Official Referee, in the hearings for his reinstatement.

"The conclusion of Judge Adel appears on page 30 of the report. It may be noted that Judge Adel was a member of the original court which disbarred Mr. Gondelman, and as he himself says, was reluctant to disturb the original judgment.

\* \* \* \* \*

"I am also enclosing a copy of our memorandum in the matter because it gives the background of the proceedings. \* \* \*

"The Adel report copy is the only one left in my file and I shall appreciate it if you would return it to me when you have finished with it."

The documents transmitted with said letter were (1) the memorandum or brief submitted on behalf of Gondelman and (2) the *first* report submitted by Judge Adel.[16] Lest Mr. Heller fail to notice, attention was directed to Judge Adel's conclusion on page 30 of that report. No

---

16. The attorney who represented the Brooklyn Bar Association in the "exoneration" proceedings was a witness before this Court. In response to questions put by the Court, he testified:

"Q. If your committee or the president of your Association asked you for a copy of Judge Adel's report, would you think that you were discharging honorably your responsibility to them if you only gave them the first report? A. No, sir. I would give them both reports.

"Q. And how would you characterize the failure to give the second report? A. I am sorry, sir. I don't understand.

"Q. Suppose your executive committee says, 'Mr. Dodd, you represented the Association. Give us the Adel report.'

"Let me repeat that: Would you give only the first report? A. No I would give both reports.

"Q. And if you failed to give the second report, would you say that you misled the Association? A. I would think so, yes.

"Q. Would you say you imposed upon them? A. I could say I wasn't presenting the matter to them fully.

"Q. Would you say only 'fully' or honestly? A. I would say I wasn't doing it honestly either."

one reading that letter would suspicion that a supplemental report had been filed by Judge Adel nor that in the supplemental report the conclusion in the first report to which attention had been specifically directed was materially changed. The brief, the letter states, was enclosed for "background" purposes. The supplemental report could hardly be regarded background material for the first report, filed approximately ten months earlier. The brief "in no way indicates that any peculiar significance should be attached to the Supplemental Report" [17] and while an entire page thereof single spaced is devoted to a quotation from the first report setting forth the favorable recommendation, "unfortunately [it] did not quote or refer to the" [18] portion of the supplemental report changing that recommendation.

A deliberate, studied attempt at misleading and confusing could not have been more successful. Judge O'Neill's letter and the material transmitted therewith hardly dispelled the inescapable effect thereof.

Promptly after receiving Judge Adel's supplemental report the Commission instituted suit in this Court against the Committee and its members individually alleging, that: (i) in furnishing to Management the Statement contained in its proxy material of April 10, 1958, relating to Gondelman's 1940 disbarment, it "had relied upon the defendant committee which had furnished the Commission with the [first] report of the Referee * * * but had failed to furnish a copy of the subsequent report of said Referee or inform the Commission of its existence, and thereby had created the belief that the recommendations in said report represented the ultimate decision of the Referee"; (ii) the individual defendants (a) in the letter to stockholders dated April 16, 1958, and (b) in the notice to stockholders issued on or about May 7, 1958, and (c) in the statement furnished on or about May 9, 1958, to stockholders who requested it pursuant to offer made in the letter of April 16 referred to in (a) above, made statements which at the time and in the light of the circumstances under which they were made were false and misleading with respect to material facts, and which omitted to state material facts necessary in order to make the statements not false or misleading, contrary to the provisions of Rule X–14 A 9 of Regulations X–14. The relief prayed for is an injunction, enjoining Gondelman and the other members of the Committee (i) from further violating the proxy rules and (ii) from exercising the power conferred by any proxy theretofore obtained unless all stockholders who furnished proxies to that group are afforded opportunity to revoke such proxies after said defendants have supplied all said stockholders with proxy material containing up-to-date information which complies with the Commission's proxy rules and corrects all statements and omissions in any proxy soliciting material heretofore furnished to said stockholders. The Company was named as a nominal defendant. No charges were made against it nor was any relief requested against it.

The Company after it became aware of the supplemental report of Judge Adel, amended its complaint to include among the alleged violations of the proxy rules the one alleged in the Commission's suit, i.e., that the individual defendant omitted to apprise the stockholders of the supplemental report and that said omission made the statements in the proxy material theretofore distributed false and misleading.

The Commission's suit and the one previously instituted by the Company were consolidated for purposes of hearing and trial. The Company filed an answer in the Commission's suit (a) admitting all of the allegations made by the Commission, but adding (i) that the conduct complained of was wilful and

---

17. Memorandum of Committee in opposition to Company's motion for a preliminary injunction, p. 11.

18. Ibid.

deliberate, and (ii) that the Committee violated the proxy rules in the additional respects set out in the amended complaint in its own suit, and (b) set up as a cross-claim against the Committee, all the claims contained in its amended complaint.

During the course of the trial the Committee as such and Sidney Gondelman entered into a stipulation with the Commission whereby the said defendants admitted the material allegations of the Commission's complaint. The defendants asserted that the failure to furnish the supplemental report was inadvertent and the Commission stipulated that the complaint was not intended to allege and was not to be construed as alleging, that said failure was wilful or intentional; that it did not contest defendant's assertion of inadvertence and that it had no evidence to offer to the contrary. The stipulations made by the Commission are consistent with the position it took at the hearings before this Court,—that, under the Securities Exchange Act of 1934 and the proxy rules, it is not material whether the Committee's conduct at issue was wilful or inadvertent, if in fact the Committee's proxy material contained any false or misleading statements, the proxy solicitation conducted by them was in violation of law. This is a correct legal concept but in the context of this case, where the character and integrity of the leader and controlling member of the insurgent group is the principal issue raised by Management, the Court cannot, within the framework of the Company's cross-claim and suit, avoid deciding the issue of wilfulness *vel-non.*

That the failure to bring the Supplemental Report of Judge Adel (of which Gondelman knew in December 1957 or January 1958) to the attention of the Commission before May 14, 1958, was deliberate has been established beyond cavil. Gondelman appeared before the Commission on February 28, 1958, armed with a copy of the report of Judge Hooley and the brief submitted by his counsel in the exoneration proceedings. An even superficial examination of these documents explains his preferences. The brief, written by his own counsel and understandably partisan, appears to have been prepared, in part at least, to placate the client. As an instrument to support his claim of innocence of the charge upon which he was disbarred in 1940, should and as the occasions to endeavor to do so arise, it cannot but be handy. Counsel for the Bar Association didn't feel that a memorandum from him was needed since the Referee's report spoke for itself and he "didn't think that the court needed any further—any aid at that time". In his report, Judge Hooley quoted at great length from a posthumous report dated some eleven years prior to the hearings before him, made by an investigator hired by Gondelman which purports to set forth conversations with others.[19] The said learned

19. Two pages of the brief which had been furnished to the Commission are devoted to a reprint of this deceased investigator's report. As Judge Hooley wrote, the said report " * * * is not any new evidence in the proceeding, but what has been previously before the court" in May 1944. Three months after the investigator's report bears date it was annexed to motion papers of Gondelman's then attorney on an application to vacate the disbarment order or to refer the proceeding for the taking of proof. This report of the investigator apparently did not impress the Appellate Division, for it denied the motion. The brief refers to another report made by the same investigator, one dated November 25, 1944, which records the investigator's opinion of what Detective Morrison can do and the latter's alleged attitude towards Mr. Gondelman. Approximately six months after the date thereof it was brought to the attention of the Appellate Division, on a second application to refer the matter back to take proof. The Brooklyn Bar Association on that motion filed a memorandum not objecting to such order of reference if the Court desired further proof. This motion like the first one was denied. Gondelman then submitted a motion for reargument or in the alternative for leave to appeal to the Court of Appeals. The Court denied both phases of that application.

Referee expressed the opinion that Mr. Diggins, one of the two principal witnesses who appeared before him, was a man of character and integrity and that the new testimony of Diggins and of one Detective Morrison "is such, *if believed,* [emphasis supplied] that it would probably change the result on a new hearing".

The "if believed" query was referred to Judge Adel for determination. Apparently Judge Adel did not believe either Diggins or Morrison. With respect to the testimony by Morrison he reported "On the whole I am not impressed with the testimony of Detective Morrison * * *"; as to Diggins he wrote: "* * * Diggins was not telling the truth, and which I with some hesitancy told him I felt was the fact when he was testifying".[20] Judge Adel did not concur in the views expressed by Judge Hooley as to the probable effect of the alleged newly discovered evidence stating: "* * * as to the newly discovered evidence which was before Mr. Justice Hooley, I am of the opinion there is nothing new which calls for interference with the [disbarment] determination made by this Court in 1940." [21]

It will be remembered that on April 16, 1958, Gondelman wrote a letter to stockholders over his signature in which he stated that the present posture of his efforts to obtain exoneration of the charge on which he was disbarred in 1940 was accurately stated in Management's letter of April 10; that statement, in part recited: "That the matter is presently pending before the Appellate Division."

On April 19, three days after the date of said letter, he instructed his attorney in the disbarment proceedings to withdraw his application for reinstatement or exoneration.[22] That fact, and of the mailing on April 22 by his attorney in the disbarment proceeding of a letter to the Appellate Division withdrawing the application, was withheld from his counsel in this proceeding, and from the Commission until May 5.

While this period is not long in terms of measurement of time ordinarily, in relation to what was then going on in the proxy contest it was of important significance. The period between the record date for determination of stockholders who would be entitled to vote at the annual meeting, April 14, and the date of the annual meeting, May 13, was thirty days. The time between April 19 and May 5 was a critical period in the campaign to obtain proxies. As it developed the so-called "flyer" disclosing Gondelman's decision to withdraw was not mailed until May 6th–7th. The likelihood that the beneficial owners of the stock registered in the names of banks or brokers would receive the "flyer" in time to act thereon was problematical. That the 1,189 individual holders who resided in foreign countries and states more distant than the North Atlantic states, would even receive the "flyer" in due time to act thereon was improbable; and as to the remaining stockholders the

20. This doubt as to Diggins' veracity was expressed by Judge Adel "vehemently". See the Supplemental Report of Mr. Justice Adel, p. 5.

21. Ibid.: see the First Report of Mr. Justice Adel, p. 23.

22. The instructions allegedly were given on April 19 by phone. Gondelman's telephone records show that the call to Judge O'Neill prior to the one on April 19 took place on April 15. He testified that he did not have a distinct recollection of what was discussed on April 15th and further:

"Q. Did you indicate to Judge O'Neill the importance of placing the date of your first call to him on this subject subsequent to April 16? A. I did.

"Mr. Wells: I object to that question.

"The Court: Objection overruled.

"A. That was never a topic of conversation.

"Q. But you had to rely for your recollection as to the date that you made that first call on the information that you got from your conversation with Judge O'Neill; isn't that true? A. I said that my memory was refreshed by my talk with Judge O'Neill as to the placing of the first talk with him."

time for them to respond—at most five days—was unreasonably short, tantamount almost to depriving them of the opportunity to formulate and exercise an informed judgment. Throughout the entire period Gondelman was in close touch with his counsel, a so-called public relations expert and the Kissel Organization, a proxy solicitation firm. This firm employed approximately thirty people during that crucial period for the purpose of communicating with stockholders in person and by telephone in an endeavor to persuade them to give their proxies to the Gondelman group. Mr. Quayle, a partner in the Kissel Organization, testified:

"Q. You mean, he [Gondelman] gave you his version of the affair [the disbarment proceedings]? A. Well, of course.

"Q. About what date was that? A. Well, we were practically living with him from I would say the 17th day of April until almost the 10th of May [that being the date when this Court enjoined further proxy solicitation]. As a matter of fact, we spent more time with him than we did at home.

"Q. So that any time there was any real question in connection with the disbarment or reinstatement proceedings, you would get his version of the facts? A. That is correct. Yes, sir.

"Q. And convey it to the stockholders? A. Yes, sir.

"The Court: When you say 'we spent the time', who is 'we'?

"The Witness: Well, Kissel and I. Honestly, off the record, Judge, we thought we married the man. We never worked with any such man before, that took up so much of our time. That was the only inference I had to that. 'We'—I am referring to Kissel and myself.

* * * * * *

"Q. Then you were working very intensely with Mr. Gondelman? A. Yes, sir.

"Q. And he was working very intensely? A. I would say so, yes.

"Q. Long hours, etc? A. Well, much too long for me."

The importance the stockholders attached to Gondelman's disbarment was the most serious problem his employees encountered in the beginning (he fixed the beginning as April 17th) and that continued until the insurgents' letter of May 1st, the so-called Nolan letter, was received. Employees of the Kissel Organization thereafter called stockholders who would not talk to them previously, and testified Quayle, "I might say then there was a change toward the committee". Would there have been a "change toward the committee" if the stockholders who previously would not even talk to the solicitors knew that Gondelman had withdrawn his petition for exoneration? The answer should not be arrived at by conjecture, rather, the stockholders should be afforded an opportunity to supply it.

The conclusion is inescapable that Gondelman's failure to cause the stockholders to be timely apprised of his decision to withdraw the petition for exoneration was wilful. The "reasons" he gave for the delay in passing this information on to his counsel in this suit— "because I didn't think it was an important issue" and "because I didn't want him [his counsel in this suit] to think that I was doubting the integrity of the Court, * * *" are patently false.

The "flyer" advised the stockholders that Gondelman's reasons for withdrawing the exoneration proceeding "are the unfavorable comments indulged in recently by Management which cast aspersions upon him and which resulted in unfavorable publicity quite harmful to his family". The truth of this statement cannot stand up under even the most cursory analysis.

When first asked by his counsel for the reason, the one he advanced was "that he did not desire to practice law any further and that he felt the referee's reports gave him all of the exoneration morally

that he wished". His counsel communicated this to the Commission. After further consideration Gondelman felt "that he didn't quite give the full story and he thereupon gave" the reasons as they emerged in the "flyer". Upon receiving this second version, Gondelman's counsel called Mr. Heller of the Commission saying: "Mr. Heller I have to give you a different statement or a more general statement as to the reasons for the withdrawal—I believe Mr. Heller said at this point that he wouldn't object to the wording of the proposed new language and he said something to indicate amusement or some feeling about the fact that we had changed the wording of the reason, why I didn't work this out before calling the first time". Mr. Heller called "attention to the consequences if these reasons turned out to be false, misleading or inaccurate".

At the hearings before this Court, Gondelman gave as additional reasons for his conduct: the suspense of waiting for the decision on his application which apparently was delayed longer than he had anticipated, that Management's proxy material might come to the attention of the Judges of the Appellate Division and possibly adversely affect their decision, though they knew everything that was contained in said material with reference to his disbarment, "any of my dealings with reference to Central Foundry they didn't know".

In response to questions by the Court, Gondelman testified:

"The Court: Tell us, Mr. Gondelman, how by withdrawing that motion you thought you would accomplish the end that you wanted to accomplish, to wit, to have an end of the issue, not to have it thrown up at you, not to have it come out again in this case?

"The Witness: That was not what I wanted to accomplish, Judge.

"The Court: What did you want to accomplish?

"The Witness: You see, it wasn't so much the issue in this campaign,

in this proxy fight, that affected me; it was the disbarment; it was the 18 years of struggle. It was fighting for exoneration where I was innocent and during the night I would get varied delusions—do this, do that; don't do this; don't do that.

"The result is that I had sleepless nights, night after night, and it came to a point where I just couldn't take it any more and I felt that if this here proxy fight was going to demoralize me to the extent of losing my health, my wife, and interfere in 18 years of struggle, I had to sacrifice it at that time and I decided that I wanted to withdraw my application until such time as I felt it would be a proper time to resubmit it.

"The Court: But how did you think you would be helped at that time by withdrawing it? Here you were, Mr. Gondelman—now, I want to be absolutely fair to you—here you were at the threshold, on the brink of having this stain upon your career eradicated. You believe that you had two favorable reports of two distinguished referees in your favor.

"Here you had a motion pending before the Court to exonerate you. How did you think it would help your peace of mind, it would help your family, it would help you in any wise to at that time withdraw the application?

"The Witness: Let me say this to you, Judge. There was a mental block in here (indicating). There are certain things in life that you can say and certain things in life that you can't say.

\* \* \* \* \* \*

"The Court: Here you were on the opportunity to realize the very thing you had been fighting for, you had the favorable reports.

"The Witness: Judge, do you want to push me to give you an answer?

"The Court: No, I don't want to push you.

"The Witness: If you want to push me to give you an answer, I will give you an answer.

"The Court: No, Mr. Witness, I don't want to push you. I don't want to push you. I would like to get an answer if you can give it. But not if you think it involves pushing or disclosing something that you think is going to hurt you.

"The Witness: Judge, this won't hurt me because anything that hurts me I am not fearful of telling you, but anything that might reflect on somebody else, upon the integrity that I want to carry to my grave if I can possibly do it. Do you understand what I am saying, Judge?

"The Court: I don't understand the answer. I don't understand what you are saying and I don't want to begin to speculate upon the implications. I shall not press my question if you would rather that I did not. But you really would help me a great deal in this whole case if you could give me some answer.

"The Witness: Judge, I want to help you and I am going to tell you this—

"The Court: Mr. Gondelman, may I suggest this—

"The Witness: May I talk to my attorney before I answer that question?

"The Court: That is what I was going to suggest. Take yourself a short recess. Consult your lawyer and make sure.

"The Witness: It doesn't affect me. It affects other people.

"The Court: Discuss it with your lawyer. Make sure because I don't want you to later on do something that you would regret.

"The Witness: Don't misunderstand me. I wouldn't be a party to anything wrong, Judge.

"The Court: I don't suggest that, but I think it would be desirable if you wanted to talk to your lawyer that you should do so and we will take a short recess.

"Mr. Wells: Your Honor, I would much prefer that the witness continue. I have no reason whatever to believe—I don't know the reason for the apparent mystery but you go right ahead, Mr. Gondelman. There is no purpose as far as I know for any sort of consultation.

"Mr. McCauley [Counsel for the Commission]: I would like to say for the Commission, your Honor, that I would suggest that the posture of the record would be much better if we continued without any recess on this particular issue.

"The Court: All right. But you understand this, you need not answer the question and for your failing to answer there will be no inference drawn which would be unfavorable to you. I emphasize that because I don't want you later on to feel that you have been pushed.

"The Witness: The only reason that I am going to answer is because I want your Honor to get a clear and an honest picture of the whole situation. If that is troubling you, I want to tell you what is in my heart and in my mind. If I can dispel any wrong suspicion, I want to do it and I think that you should know it, too.

*     *     *     *     *     *

"The Witness: I felt that after this unpleasant writeup in these papers of management that it would affect somewhat the Appellate Division; not that I was at all perturbed about the outcome of the case but I was fighting with myself on one angle; what is the Appellate Division going to think? What are they going to think? How is this going to affect my case?"

What Gondelman's counsel characterized as "an apparent mystery" was never

solved by the witness though given the fullest opportunity to do so.

When Gondelman was interrogated by counsel for the Commission, the following ensued:

"By Mr. Cooney:

"Q. Mr. Gondelman, first I want to refer to your testimony of yesterday with respect to the withdrawal of your application for reinstatement. You stated yesterday that—

\* \* \* \* \* \*

"Q. (Continuing) 'This won't hurt me, because anything that hurts me I am not fearful of telling you, but anything that might reflect on somebody else, upon their integrity, that I want to carry with me to my grave if I can possibly do it.'

"Now, whose integrity were you referring to in that statement, Mr. Gondelman?

"A. I was referring to the integrity of the Appellate Division, and I was referring that—

"The Court: You have answered the question, unless there are others.

"The Witness: Yes.

"The Court: Only to the Appellate Division?

"The Witness: The Appellate Division.

\* \* \* \* \* \*

"The Witness: Who I had in mind when I said that I may carry it to my grave. That which concerns me I carry to my grave.

"Q. Whose integrity—

"The Witness: That which I may challenge the integrity of others, I don't want to state. Is that what you are having reference to?

"Q. You stated— A. Let me ask that question to you. I don't mean any part of the SEC, if that's what you have any reference to. That's definitely no. As far as the SEC is concerned, I have the highest respect for everybody who's

been associated, because they have been fair and square with me.

"Q. You would say that your withdrawal itself was not motivated by the desire to protect the integrity of another? A. No. Not to protect the integrity of another.

"Q. Your desire not to be pressed on that question was motivated by a desire not to question anyone's integrity? A. I desired not to be pressed, because I had certain ideas of certain things which I didn't want to divulge."

Which, if any, of the reasons assigned by Gondelman for withdrawing his petition for exoneration prompted him to do so, is the true one is not necessary to be determined, but certain it is that the reasons in the "flyer" were false.

Management urges that Gondelman's failure to disclose his dominant position in the Committee, that (a) he was the sole organizer thereof, (b) he alone has financed its operation, (c) each of the other six members of the Committee joined at his invitation, and (d) every candidate for the office of Director on the Committee's slate owes his nomination to him, renders the oral communications to stockholders made by the corps of proxy solicitors working on behalf of the Committee, false and misleading. The solicitors were briefed to say, Management's "attack was upon one man out of a seven man slate \* \* \*— let's not talk about Gondelman he is relatively unimportant" "let's talk about the other people"—"He is just one of seven men on this Committee \* \* \* and let's talk about the other six men and who they are". Mr. Quayle in reciting the briefing of the solicitors stated: "that is how we tried to take away any play that the stockholders might have in reference to Mr. Gondelman because we frankly told the stockholders we were not defending Mr. Gondelman". The strategy of the Committee obviously was to shield Gondelman behind his six selectees.

The omission to disclose in the oral solicitations Gondelman's true position,

vis-a-vis the Committee, was purposely evolved and executed with a view to misleading the stockholders. Literally, of course, Gondelman was one of a committee of seven. Realistically in the context in which the oral communications were made and the avowed purposes for which they were made, they could have had but only the intended effect.

Defendants argue in their brief that the omissions were cured by Management's own material which called attention to Gondelman's role as the principal figure in the Committee. In so urging defendants overlook (i) that the truth or falsity of the oral statements made by the defendants' solicitors is to be determined by reference to the statements themselves, unaided by Management's efforts to depict the facts; surely an untrue statement made by one and so characterized by another does not render the false statement true; and (ii) Management's endeavor to disseminate the facts was naturally impeded by the false and misleading statements.

Unless it be suggested that the stockholders were imprudent in relying on the information imparted to them by the solicitors, it is no answer that the Schedules 14–B filed by the Committee and the individual members thereof, which are public records, set out the facts. We are not called upon to adjudicate whether, in the absence of the misleading oral communications, filing of the Schedules 14–B would, in this case, be sufficient compliance with the disclosure requirements of the Securities Exchange Act of 1934. When, however, the solicitors volunteered information as to Gondelman's role, their omission to state material facts necessary to make their utterances not false or misleading violated the mandate of the Act.

The problem we now come to is the appropriate relief in the premises. In fashioning the decree the Court is concerned principally with the rights and interests of the approximately 4,900 beneficial owners of the Company's stock. True, the parties to the Company's suit are two groups contending for control.

As their respective rights and interests are not to be overlooked, so must we be mindful of those of the large body of stockholders.

The Securities Exchange Act of 1934 and the proxy rules promulgated pursuant thereto interdict solicitation of proxies by means of any communication, written or oral, containing any statement which is false or misleading with respect to any material fact or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication. The proxies procured by the insurgent group are thus permeated with the taint of unlawfulness.

The decree consented to by the defendants and the Commission would in effect merely require the Committee to supply all stockholders who furnished proxies to them with material correcting the misstatements complained of in its complaint. To decree that the stockholders who gave their proxies to the Committee may revoke them, is to confer no greater right than they presently have. The Commission's counsel stated at the time the stipulation was entered on the record that "this is not the remedy we have suggested, it is the remedy that we have required in our action and we do not in any way try to make the Court believe that we think the Court ought not to use its own discretion in granting relief."

Placing the onus of obtaining restitution upon the misled stockholders is not here "appropriate in the public interest", nor the relief best calculated "for the protection of investors". The facts developed upon the hearings before this Court compel a holding that the proxies procured by the Committee are void. See S.E.C. v. May, D.C.S.D.N.Y.1955, 134 F.Supp. 247, affirmed 2 Cir., 1956, 229 F.2d 123; S.E.C. v. Okin, D.C.S.D. N.Y.1944, 58 F.Supp. 20. See also Loss, Securities Regulation p. 544 (1951). Only thus will the stockholders be in the position they occupied before they acted in reliance upon the unlawful

soliciting material. Then, supplied with proxy material containing up-to-date information which complies with the proxy rules and corrects all misstatements and omissions in the proxy material theretofore received from the Committee, they will be in a position to act with the truth before them as they think is in their best interests. The meeting of stockholders is adjourned to September 26, 1958, at the same place and hour as heretofore scheduled. The adjournment will permit of ample time for resolicitation.

Defendants argue that to deprive the Committee of the right to exercise the proxies they procured would be tantamount to disenfranchising the stockholders from whom they were obtained. The error inherent in this contention flows from the failure to distinguish between the rights of an agent who procured his appointment in contravention of law and those of his principal, here, the stockholder. If the result is that any of said stockholders are disenfranchised it would flow not from the decree declaring their proxies void in the hands of the agent but from the acts of the Committee, in contravention of the statute, which interfered with the stockholders' right to formulate an informed judgment based on truth. Viewing it from the interests of the stockholders, the choice is obvious as between failing to exercise the franchise and exercising it influenced by an unlawful solicitation.

Defendants contend that to void the proxies procured by the Committee and not those received by Management, would disadvantage the Committee. In so urging they overlook that advantage or disadvantage, if any, as between the two is not the issue before the Court and that the disadvantage, if any, to the Committee results only from its own unlawful conduct. Cf. U. S. v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 1952, 195 F. 2d 838; In re American Fuel & Power Co., 6 Cir., 1941, 122 F.2d 223. Moreover, there is no basis in law which would justify interference by the Court with Management's exercise of the proxies it lawfully obtained.

Still another contention is urged by the Committee—a novel one indeed—that their successful imposition upon the Commission in causing it to insist upon inclusion in Management's letter of false and misleading material should somehow enure to their benefit. The correctness of this position depends upon the soundness of the bottom upon which it is laid, to wit: that the Commission erred in relying on Gondelman's sworn testimony before it, and that the Commission should have read into Judge O'Neill's brief that which "unfortunately [it] did not quote or refer to." See note 18, supra, and accompanying text.

It is urged that Management knew of the Adel supplemental report and of the withdrawal of Gondelman's petition for exoneration before information thereof came to the attention of defendant's counsel and the Commission. The evidence in this case is to the contrary.

Any proxy soliciting material hereafter used by the defendants in connection with the 1958 annual meeting shall contain up-to-date information which complies with the Commission's proxy rules and explicitly and definitively corrects all misstatements and omissions in any proxy soliciting material heretofore furnished to the stockholders. In its first piece of proxy material the Committee shall in addition set forth succinctly and with clarity:

(i) that the resolicitation has become necessary as the result of a determination by a Court in suits brought by the Company and the Securities & Exchange Commission against the Committee and its members that in material respects the Committee's proxy solicitations, written and oral, violated the Securities Exchange Act of 1934 and the proxy rules of the Securities & Exchange Commission promulgated thereunder and were, therefore, unlawful;

(ii) all the information contained in the Schedules 14–B filed by the Committee and each of the members thereof in such compact and understandable man-

ner as will clearly and accurately convey all the information contained therein;

(iii) that the information contained in Management's letter of April 10, 1958, setting forth the posture of the proceedings for exoneration with respect to Gondelman's 1940 disbarment, was included at the insistence of the Commission which in so doing had relied upon false and misleading information given to it by the Committee.

The foregoing directions with respect to the "corrective" material are made because of the extended hearings held before this Court and, of course, without any purpose or intent to encroach upon the duties and authority of the Commission.

The foregoing shall constitute Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a), 28 U.S.C.A.