## UNITED STATES v. CRESCENT AMUSEMENT CO. ET AL.

NOS. 17 AND 18.

Argued November 6, 7, 1944.—Decided December 11, 1944.

*Assistant Attorney General Berge* and *Mr. Robert L. Wright,* with whom *Solicitor General Fahy* and *Messrs. Charles H. Weston* and *Chester T. Lane* were on the brief, for the United States.

*Mr. William Waller,* with whom *Mr. Geo. H. Armistead, Jr.* was on the brief, for appellees in Nos. 17 and 18 and appellants in No. 19.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The United States brought this civil suit against nine affiliated companies (whom we will call the exhibitors) operating motion picture theatres in some 70 small towns in Alabama, Arkansas, Kentucky, Mississippi, and Tennessee; against certain officers of these companies; and against eight major distributors of motion picture films, charging them with a conspiracy unreasonably to restrain interstate trade and commerce in motion-picture films and to monopolize the exhibition of films in this area in violation of § 1 and § 2 of the Sherman Act. 26 Stat. 209, 15 U. S. C. §§ 1, 2. The suit was dismissed against five of the distributors on motion of the United States.[1] Of the other three the Court found that only one had violated the Sherman Act. The court also found that seven of the exhibitors and three of the individual defendants had violated the Sherman Act substantially as charged. It entered a decree against them. From the judgment en-

---

[1] This was done after a consent decree had been entered against five of the major distributors in *United States* v. *Paramount Pictures, Inc.* This dismissal did not eliminate the charge that these distributors had conspired with the defendant exhibitors to restrain and monopolize trade. And some of the distributors, though dismissed from the case, were found to be co-conspirators with the exhibitors in making franchise agreements and in licensing films for the purpose of maintaining the exhibitors' theatre monopolies and of preventing the independents from competing.

tered the United States, six of the exhibitors, and three individual defendants appeal directly to this Court under § 2 of the Act of February 11, 1903, 32 Stat. 823, 15 U. S. C. § 29 and § 238 of the Judicial Code, as amended by the Act of February 13, 1925, 43 Stat. 936, 938, 28 U. S. C. § 345.

I. Before we come to the merits there is a preliminary question as to whether the appeal of the United States in No. 17 is premature. The District Court entered a final judgment in this case on May 17, 1943. On the sixtieth day after judgment there were motions pending to amend the findings. On that day the appeal was applied for and allowed. On August 30, 1943, the court ruled on the motions to amend its findings. Within sixty days thereafter the United States applied for the appeal in No. 18 and it was allowed. The appeal in No. 17 was filed here at the same time as that in No. 18. The appellees move to dismiss No. 17 on the ground that it was premature and to dismiss No. 18 on the ground that the District Court by allowing the first appeal lost jurisdiction of the cause and was without power to allow a further appeal. We think the motion to dismiss the appeal in No. 17 must be granted and the motion to dismiss the appeal in No. 18 denied.

The motion to amend the findings tolled the time to appeal if it was not addressed to "mere matters of form but raised questions of substance," e. g., if it sought a "reconsideration of certain basic findings of fact and the alteration of the conclusions of the court." *Leishman* v. *Associated Electric Co.*, 318 U. S. 203, 205. An examination of the motion makes plain that matters of substance were raised. The appeal in No. 17 was accordingly premature. *Zimmern* v. *United States*, 298 U. S. 167. But it does not follow that the District Court had no jurisdiction to allow the appeal in No. 18. An appeal can hardly be premature (and therefore a nullity) here and yet not

premature (and therefore binding) below. Under these circumstances an appellant may rely upon the later appeal (*Ohio Public Service Co.* v. *Fritz*, 274 U. S. 12) and not run the risk of losing an appellate review on the appeal first allowed. Cf. *Wilentz* v. *Sovereign Camp*, 306 U. S. 573.

II. We turn to the merits. Crescent, the principal exhibitor,[2] owns 50% of the stock of Cumberland and Lyric. The majority of Crescent's stock is owned by defendant Sudekum, by certain of his relatives, and by defendants Stengel and Baulch. Prior to 1937 Crescent owned almost two-thirds of the stock of Muscle Shoals; since that time Muscle Shoals was run as a partnership in which Sudekum's wife had a half-interest. Defendant Stengel, Sudekum's son-in-law, is the record holder of all of Rockwood's stock. Rockwood owns 50% of the stock of Cherokee and Kentucky and of five other theatre corporations. Rockwood was operated as a "virtual branch" of the Crescent business under the immediate supervision of Stengel. Sudekum is president of Crescent, Cumberland, and Lyric; Stengel is an officer and director of Kentucky and Cherokee. Sudekum was paid $200 a week by Cherokee "for his advice and assistance in running the business." Each of these companies was an exhibitor operating motion picture theatres.

In the five-year period ended in August 1939 when this bill was filed the exhibitors experienced a rather rapid growth—in the number of towns where their theatres were operated; in the number of towns where they operated without competition; in their earnings and surplus. The United States claims that that growth was the prod-

---

[2] Crescent is used for Crescent Amusement Co.; Cumberland for Cumberland Amusement Co.; Lyric for Lyric Amusement Co., Inc.; Cherokee for Cherokee Amusements, Inc.; Kentucky for Kentucky Amusement Co., Inc.; Muscle Shoals for Muscle Shoals Theatres; and Rockwood for Rockwood Amusement Co.

uct of restraints of trade in violation of § 1 of the Sherman Act and of monopolistic practices in violation of § 2.

The District Court found that each of the seven exhibitors had violated the Sherman Act by

"A. Creating and maintaining an unreasonable monopoly of the business of operating theatres in the towns of Tennessee, Northern Alabama, and Central and Western Kentucky, in which each has theatres.

"B. Combining its closed towns with its competitive situations in licensing films for the purpose and with the effect of compelling the major distributors to license films on a non-competitive basis in competitive situations and to discriminate against its independent competitors in licensing films.

"C. Coercing or attempting to coerce independent operators into selling out to it, or to abandon plans to compete with it by predatory practices."

The court found that these violations were effected (a) by combining with each other and with certain major distributors in making franchises, i. e. term contracts for the licensing of films, with the purpose and effect of maintaining their theatre monopolies and preventing independents from competing with them; (b) by combining with each other for the purpose of dividing the territory in which theatres might be operated by any of them; (c) by combining with each other for the purpose and with the effect of eliminating, suppressing, and preventing independents from competing in the territory in which each operated; and (d) by combining with each other and with certain major distributors in licensing films for the purpose and with the effect of maintaining their theatre monopolies and preventing independents from competing with them. Three of the individual defendants were found to have participated actively in these violations.

Interstate commerce was found to have been employed in consummating the conspiracy. In the selling season each year the distributor's salesmen solicit contracts from the exhibitors for the distributor's approval by the home office. As the films are released for exhibition, prints are sent to the numerous exchanges located in various states and delivered by them to the exhibitors in their respective areas.[3] The exhibitor ordinarily returns the print to the distributor's exchange, from which it is supplied to other theatres. The findings are wholly adequate to establish that the business of the exhibitors involves a regular interchange of films in interstate commerce. As we shall see, that course of business may be sufficient to make the Sherman Act applicable to the business of exhibiting motion pictures. *Interstate Circuit* v. *United States,* 306 U. S. 208. Cf. *Binderup* v. *Pathe Exchange,* 263 U. S. 291. The crucial issues in the present case relate to the evidence and the appropriateness of the decree.

III. The defendants assert that the United States failed to prove the allegations of the complaint as amplified by the bill of particulars. But no such error was assigned. The only assignments on this phase of the case relate to subsidiary findings which are parts of sixteen of the one hundred and eighty-seven findings of fact contained in one hundred and twenty printed pages. Hence they are the only ones we will consider. *Seaboard Air Line R. Co.* v. *Watson,* 287 U. S. 86, 91; *E. R. Squibb & Sons* v. *Mallinckrodt Chemical Works,* 293 U. S. 190; Rule 9, 275 U. S. 600. We have examined them and conclude that they do not constitute reversible error. If any modifications were made in these subsidiary findings they would not be basic or essential ones.

---

[3] The defendant exhibitors during the five-year period preceding the filing of this suit paid about 90% of their total film rental to the eight major distributors.

The crux of the government's case was the use of the buying power of the combination for the purpose of eliminating competition with the exhibitors and acquiring a monopoly in the areas in question. There was ample evidence that the combination used its buying power for the purpose either of restricting the ability of its competitors to license films or of eliminating competition by acquiring the competitor's property or otherwise. For example, the defendants would insist that a distributor give them monopoly rights in towns where they had competition or else defendants would not give the distributor any business in the closed towns where they had no competition. The competitor not being able to renew his contract for films would frequently go out of business or come to terms and sell out to the combination with an agreement not to compete for a term of years. The mere threat would at times be sufficient and cause the competitor to sell out to the combination "because his mule was scared." In that way some of the affiliates were born. In summarizing various deals of this character the District Court said, "Each of these agreements not to compete with Crescent or its affiliates in other towns extended far beyond the protection of the business being sold, and demonstrated a clear intention to monopolize theatre operation wherever they or their affiliates secured a foothold." [4]

---

[4] The expansion of the combination during this period was summarized by the District Court as follows:

"On August 11, 1934, the defendant exhibitors and their affiliates operated in thirty-two towns in Tennessee (excluding Nashville), Kentucky, and Alabama, in six of which they had competition. On August 11, 1939, the defendant exhibitors and their affiliates, with the exception of Strand, heretofore dismissed as a defendant, operated in seventy-eight towns in Tennessee (excluding Nashville), Kentucky, Alabama, and North Carolina, in five of which they had competition, and the only towns in which they have competition today outside of Nashville, are Gadsden, Alabama, Harriman, Gallatin and McMinn-

The same type of warfare was waged with franchise contracts with certain major distributors covering a term of years. These gave the defendants important exclusive film-licensing agreements. Their details varied. But generally they gave the defendant exhibitors the right to first-run exhibition of all feature pictures which they chose to select in their designated towns. Clearances over the same or nearby towns were provided, i. e. a time lag was established between the showing by the defendant exhibitors and a subsequent showing by others. The opportunity of competitors to obtain feature pictures for subsequent runs was further curtailed by repeat provisions

---

ville, Tennessee, and Franklin, Kentucky. In two of these towns— Gadsden, Alabama, and Harriman, Tennessee—the independent theatres have opened since the filing of this suit and two more— Franklin, Kentucky, and Gallatin, Tennessee—are towns which Crescent entered less than two years before the filing of this suit.

"Of the forty-five towns in Tennessee listed in the 1940 census as having populations between 2,500 and 10,000, Crescent and its affiliates now operate theatres in all but nine. The independents operating in three of those nine towns have already been approached by Sudekum emissaries with the suggestion that they sell to one of the defendant exhibitors."

Their financial growth was found to be "out of all proportion" to their physical expansion:

"During the five-year period immediately preceding the suit, the Crescent and Rockwood companies each experienced a phenomenal growth in earnings and surplus which was out of all proportion to the increase in gross receipts and gross assets resulting from physical expansion of the business and improving general economic conditions. During the five-year fiscal period from June 30, 1934 to June 30, 1939, Crescent's total assets were less than doubled, but its surplus was increased thirty times. During the last fiscal year of said period its gross receipts were less than twice the amount of its gross receipts for the first fiscal year of said period, but its net profits (exclusive of dividends received) were more than five times those of the first year. During the five-year period, its net earnings (exclusive of dividends received) averaged about 35 per cent per annum, on its capitalization."

which gave the defendant exhibitors the option of showing the pictures in their theatres a second time. In reviewing one of these franchise agreements the District Court concluded, "The repeat-run clause in the franchise was completely effective in preventing the sale of a second-run of any Paramount features to any opposition theatre."

We are now told, however, that the independents were eliminated by the normal processes of competition; that their theatres were less attractive; that their service was inferior; that they were not as efficient businessmen as the defendants. We may assume that if a single exhibitor launched such a plan of economic warfare he would not run afoul of the Sherman Act.[5] But the vice of this undertaking was the combination of several exhibitors in a plan of concerted action. They had unity of purpose and unity of action. They pooled their buying power for a common end. It will not do to analogize this to a case where purchasing power is pooled so that the buyers may obtain more favorable terms. The plan here was to crush competition and to build a circuit for the exhibitors. The District Court found that some of the distributors were co-conspirators on certain phases of the program. But we can put that circumstance to one side and not stop to inquire whether the findings are adequate on that phase of the case. For it is immaterial whether the distributors technically were or were not members of the conspiracy. The showing of motion pictures is of course a local affair. But action by a combination of exhibitors to obtain an agreement with a distributor whereby commerce with a competing exhibitor is suppressed or restrained is a conspiracy in restraint of trade and a conspiracy to monopo-

---

[5] A union of the exhibitor with a distributor in such a program would of course constitute a conspiracy under the Sherman Act as held in *Interstate Circuit* v. *United States*, 306 U. S. 208.

lize a part of the trade or commerce among the States, each of which is prohibited by the Sherman Act. And as we have said, the course of business which involves a regular exchange of films in interstate commerce is adequate to bring the exhibitors within the reach of the Sherman Act. *Interstate Circuit* v. *United States, supra.*

The exhibitors, however, claim that the findings against them on the facts must fall because of improper evidence. The evidence to which this objection is directed consists of letters or reports written by employees of certain of the major distributors to other employees or officers in the same company stating reasons why the distributor was discriminating against an independent in favor of the defendants. The United States asserts that these letters or reports were declarations of one conspirator in furtherance of the common objective and therefore admissible as evidence against all under the rule of *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229, 249. And it is argued that it makes no difference that these distributors were dismissed out of the case (*Delaney* v. *United States, 263 U. S. 586, 590*) since they were charged with being co-conspirators and since the findings are with certain exceptions adequate to support the charge. We do not come to that question. The other evidence established the position of the distributors and their relations to the theatres involved, what the distributors in fact did, the combination of the defendants, the character and extent of their buying power, and how it was in fact used. This other evidence was sufficient to establish the restraints of trade and monopolistic practices; the purpose, character, and extent of the combination are inferable from it alone. Thus even if error be assumed in the introduction of the letters and reports, the burden of showing prejudice has not been sustained.

The defendants finally object to the findings on the ground that they were mainly taken verbatim from the

government's brief. The findings leave much to be desired in light of the function of the trial court. See *United States* v. *Forness*, 125 F. 2d 928, 942–943. But they are nonetheless the findings of the District Court. And they must stand or fall depending on whether they are supported by evidence. We think they are.

IV. The major controversy here has turned on the provisions of the decree.

A. *Objections of the United States.* The United States objects to the provision of the decree that no defendant exhibitor shall acquire a financial interest in any additional theatre outside Nashville in any town where there already is a theatre "unless the owner of such theatre should voluntarily offer to sell same to either of the exhibitor defendants, and when none of said defendants, their officers, agents or servants are guilty of any of the acts or practices prohibited by paragraph nine (9) hereof." Paragraph 9 referred to enjoins the defendants "from coercing or attempting to coerce independent operators into selling out to it, or to abandon plans to compete with it by predatory practices." It asks that there be substituted for that provision one which the District Court had earlier approved restraining such acquisitions "except after an affirmative showing that such acquisition will not unreasonably restrain competition."

The Court at times has rather freely modified decrees in Sherman Act cases where it approved the conclusions of the District Court as to the nature and character of the violations. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 78–82. *United States* v. *American Tobacco Co.,* 221 U. S. 106, 184–188. We recognize however that there is a wide range of discretion in the District Court to mould the decree to the exigencies of the particular case; and where the findings of violations are sustained, we will not direct a recasting of the decree except on a showing of abuse of discretion. See *Ethyl Gasoline Corp.* v. *United*

*States,* 309 U. S. 436, 461; *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 725, 728. We think this is a case where we should act lest the public interest not be adequately protected by the decree as cast.

The generality of this provision of the decree bids fair to call for a retrial of a Sherman Act case any time a citation for contempt is issued. The crucial facts in each case would be subtle ones as is usually true where purpose and motive are at issue. This type of provision is often the only practical remedy against continuation of illegal trade practices. But we are dealing here with a situation which permits of a more select treatment. The growth of this combine has been the result of predatory practices condemned by the Sherman Act. The object of the conspiracy was the destruction or absorption of competitors. It was successful in that endeavor. The pattern of past conduct is not easily forsaken. Where the proclivity for unlawful activity has been as manifest as here, the decree should operate as an effective deterrent to a repetition of the unlawful conduct and yet not stand as a barrier to healthy growth on a competitive basis. The acquisition of a competing theatre terminates at once its competition. Punishment for contempt does not restore the competition which has been eliminated. And where businesses have been merged or purchased and closed out it is commonly impossible to turn back the clock. Moreover if the District Court were to supervise future acquisitions in this case, it would not be undertaking an onerous and absorbing administrative burden. The burden would not seem more onerous than under the alternative provision where in substance the issue would be violation of the Sherman Act *vel non.*

These considerations impel us to conclude that the decree should be revised so as to prohibit future acquisitions of a financial interest in additional theatres outside of

Nashville "except after an affirmative showing that such acquisition will not unreasonably restrain competition."

B. *Objections of the Defendants.* (1) The decree enjoins the defendant exhibitors from making franchises with certain distributors "with the purpose and effect of maintaining their theatre monopolies and preventing independent theatres from competing with them" and from entering into "any similar combinations and conspiracies having similar purposes and objects." The decree also enjoins them from combining, in licensing films, their closed towns with their competitive situations "for the purpose and with the effect of compelling the major distributors to license films on a non-competitive basis in competitive situations and to discriminate" against the independents. The decree also enjoins each defendant exhibitor "from conditioning the licensing of films in any competitive situation (outside Nashville) upon the licensing of films in any other theatre situation."

It is argued that these provisions will aggrandize the distributors at the expense of the exhibitors, that if such measures are taken they should be taken against the distributors, that they deprive the exhibitors of group purchasing power, that the franchise agreements are normal and necessary both for distributors and exhibitors, and that these provisions of the decree are so vague and general as to greatly burden the conduct of these businesses.

It is not for us, however, to pick and choose between competing business and economic theories in applying this law. Congress has made that choice. It has declared that the rule of trade and commerce should be competition, not combination. *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 397; *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457, 465. Since Congress has made that choice, we cannot refuse to sustain a decree because by some other measure of the public

good the result may not seem desirable. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 221–222. The duty of the Court in these cases is "to frame its decree so as to suppress the unlawful practices and to take such reasonable measures as would preclude their revival." *Ethyl Gasoline Corp.* v. *United States, supra,* p. 461. The chief weapons used by this combination in its unlawful warfare were the franchise agreements and the licensing system. The fact that those instruments could be lawfully used does not mean that the defendants may leave the court unfettered. Civil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance or resumption of the unlawful practice. And it is hard to see how the decree could be made less general and more specific. If it is a burden which cannot be lightened by application to the court for exercise of the power which it has reserved over the decree, it is a burden which those who have violated the Act must carry. And the fact that there may be somewhere in the background a greater conspiracy from which flow consequences more serious than we have here is no warrant for a refusal to deal with the lesser one which is before us.

(2) Serious complaint is made of the divestiture provisions of the decree. It requires each corporate exhibitor to divest itself of the ownership of any stock or other interest in any other corporate defendant or affiliated corporation,[6] and enjoins it from acquiring any interest in those companies. Sudekum is required to resign as an officer of any corporation (except Crescent) which is affiliated with any defendant exhibitor and he is enjoined from acquiring control over any such affiliate (except Crescent) by acting as officer or otherwise. Stengel is required to resign as

---

[6] Defined in the decree to exclude certain companies.

officer of the affiliates (except one corporation of his choice) and is enjoined from acquiring any control over the others by acting as an officer or otherwise. A year from the date of entry of the decree is allowed for completing this divestiture.

It is said that these provisions are inequitable and harsh income tax wise, that they exceed any reasonable requirement for the prevention of future violations, and that they are therefore punitive.

The Court has quite consistently recognized in this type of Sherman Act case that the government should not be confined to an injunction against further violations. Dissolution of the combination will be ordered where the creation of the combination is itself the violation. See *Northern Securities Co.* v. *United States,* 193 U. S. 197, 354–360; *Standard Oil Co.* v. *United States, supra; United States* v. *American Tobacco Co., supra,* pp. 186–188; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61, 97; *United States* v. *Reading Co.,* 253 U. S. 26, 63; *United States* v. *Lehigh Valley R. Co.,* 254 U. S. 255; *United States* v. *Southern Pacific Co.,* 259 U. S. 214; *United States* v. *Corn Products Refining Co.,* 234 F. 964, 1018. Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience. That principle is adequate here to justify divestiture of all interest in some of the affiliates since their acquisition was part of the fruits of the conspiracy. But the relief need not, and under these facts should not, be so restricted. The fact that the companies were affiliated induced joint action and agreement. Common control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues, there will be tempting opportunity for these exhibitors to continue to act in combination

against the independents. The proclivity in the past to use that affiliation for an unlawful end warrants effective assurance that no such opportunity will be available in the future. Hence we do not think the District Court abused its discretion in failing to limit the relief to an injunction against future violations. There is no reason why the protection of the public interest should depend solely on that somewhat cumbersome procedure when another effective one is available.

The fact that minority stockholders of the affiliated companies are not parties to the suit is no legal barrier to a separation of the companies. *United States* v. *American Tobacco Co., supra.* No legal right of one stockholder is normally affected if another stockholder is required to sell his stock. And no exception to that rule has been shown to exist here. Only business inconvenience and hardship are asserted. It is said, however, that the decree requires Rockwood and Cherokee (two defendant exhibitors) to sell their respective half-interests in two companies which were not made parties to the proceedings. The argument is that the latter companies are indispensable parties if such divestiture is required. Reliance is placed on *Minnesota* v. *Northern Securities Co.*, 184 U. S. 199. In that case Minnesota brought an original action in this Court alleging that the acquisition by Northern Securities Co. of the majority stock of two railroad companies effected a consolidation of the railroads in violation of Minnesota law. Minnesota asked, among other things, for an injunction against Northern Securities Co. voting the stock of those companies. The Court held that the two railroad companies were indispensable parties; and since the jurisdiction of the Court would have been defeated if they were joined, leave to file the bill was denied. Denial of the right of a majority stockholder to vote his stock would deprive the corporation of a board of direc-

tors elected in accordance with state law. If such a step were taken, the corporation should be a party so that all corporate interests might be represented. *Minnesota* v. *Northern Securities Co.* goes no farther than that. Here there is no showing of any complication of that order. If such a complication appeared, the District Court could bring in the two affiliates as parties in order to effectuate the decree. *United States* v. *Southern Pacific Co., supra,* p. 241. But on this record it does not appear that if Rockwood and Cherokee are required to sell their half-interests in those companies any legal right of any other stockholder would be affected. Cf. *Morgan* v. *Struthers,* 131 U. S. 246.

We have considered the other contentions and find them without merit.

The appeal in No. 17 is dismissed.

The judgment in No. 18 is reversed.

The judgment in No. 19 is affirmed.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, MR. JUSTICE MURPHY, and MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE ROBERTS dissents.