Einard NYYSSONEN, Plaintiff, Appellant,

v.

BENDIX CORPORATION, Defendant, Appellee.

No. 6189.

United States Court of Appeals First Circuit.

March 3, 1965.

Robert H. Rines, Boston, Mass., with whom David Rines and Rines & Rines, Boston, Mass., were on brief, for appellant.

Morris Relson, New York City, with whom Floyd H. Crews and Robert R. Keegan, New York City, were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Senior Circuit Judge (by designation).

We are concerned on this appeal with two patents issued to the plaintiff-appellant on the same day, April 23, 1957. One, No. 2,790,098, is for a Polyphase Synchronous Machine; the other, No. 2,-790,131, is for a Polyphase Transformer System.[1] In issue are claims 1 and 10 of the 098 patent and claim 1 of the 131 patent. The court below found all three claims both invalid and not infringed, and entered a judgment dismissing the plaintiff's complaint from which he has taken this appeal.[2]

The patents are long. One consists of 11 pages of drawings (26 figures) and almost 50 columns of text, and the other 9 pages of drawings (21 figures) and almost 44 columns of text. Both are highly technical in the fields of advanced mathematics and electrical engineering in which no member of this court can profess any competence. We can say with the court below that this case presents great difficulties to judges like ourselves who have only the most elementary training in science and mathematics and little experience with modern technological developments.

The court below in recognition of its avowed limitations rested its decision basically on its evaluation of the relative credibility of opposing expert witnesses. In view of the extreme technicality of the subject matter and the serious risk of making scientific and technological errors, the court invited each party to submit draft findings of fact. Then, concluding on the basis of observation at the trial and rereading the transcript that the defendant's expert was the clearer, more credible and more expert, it adopted the defendant's draft. It did not do so as a matter of rote, however. It said:

> "Defendant's draft, as appears from supporting citations, rests, in the places where the issues are sharpest, upon Dr. Frazier's testimony and upon admissions by plaintiff's counsel and plaintiff's own expert. My own findings of fact are in most respects verbatim copies of this draft, but these findings do reflect my independent and meticulous check of the record itself."

The plaintiff-appellant complains of the District Court's technique of decision asserting that it deprives him of due process of law. We do not agree.

Counsel are certainly entitled to file proposed findings of fact on their own initiative and we see nothing whatever in any way irregular for a court to ask them to do so, particularly in a highly technical and complicated case like the present. Nor is there any reason why counsel should not cast their requests in a form which if approved could be adopted by the court as its findings. Hazeltine Research, Inc., v. Admiral Corp., 183 F.2d 953 (C.A. 7, 1950), cert. denied, 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650. Ordinarily we think it the better practice for the trial court to prepare its own findings with such help as it may derive from counsels' requests. But this is no ordinary case. In a case of this difficulty we think the court below was fully justified in avoiding the risk of slipping inad-

---

1. We shall refer to the patents hereinafter by the last three digits of their respective numbers.

2. He also appealed from orders denying motions under Rule 52(b) and 59(a) of the Federal Rules of Civil Procedure.

vertently into serious scientific error by relying heavily upon counsel for technical findings based upon highly technical evidence. The question is whether the findings are supported by the evidence. United States v. Crescent Amusement Co., 323 U.S. 173, 184–185, 65 S.Ct. 254, 89 L.Ed. 160 (1944).

We turn now to the patents themselves.

A synchronous machine such as is covered in the 098 patent is defined by the American Institute of Electrical Engineers in its Standard Definitions as "* * * one in which the average speed of normal operation is exactly proportional to the frequency of the system to which it is connected." These machines consist, as we understand it, either of a synchronous generator, defined on the same authority as "* * * a synchronous alternating current machine which transforms mechanical power into electrical power" or a synchronous motor defined as "* * * a synchronous machine which transforms electric power from an alternating current system into mechanical power." The purpose of these machines operating together in a synchronous system is to transmit synchronized rotary motion over a distance by means of electricity. An electric clock is an example.

Almost all electric power produced in this country is 60-cycle alternating current. This means that the current reverses in direction from positive to negative and from negative back to positive again 120 times per second. Each cycle includes current in one direction for $\frac{1}{120}$ of a second and current in the opposite direction for the next $\frac{1}{120}$ of a second. The current is maintained at this frequency of alternation by running the synchronous generator which produces the current at constant speed, the frequency of the current being in direct proportion to the speed of rotation of the rotor of the generator. An electric clock uses a synchronous motor and keeps accurate time for two reasons. The first

is that the generator is maintained at constant speed to produce a constant 60-cycle frequency. The second is that the synchronous motor in the clock runs at a speed directly proportional to the frequency of the current supplied to it. The hands move $\frac{1}{60}$ of a second for each full cycle of current.

The art of synchronous machines is not new. They have been known and used at least since about the turn of the century as appears from the reference to such machines in Patent No. 785,995 issued to Alexanderson on March 28, 1905. Nyyssonen's claimed contribution to the art is smaller size and greater accuracy, which he says he attained by novel means. The defendant-appellee disputes Nyyssonen's claimed contributions, denies the novelty of his means and asserts that the accused devices it manufactures do not infringe even if Nyyssonen's patents are valid. The court below resolved these issues against the plaintiff. It held all claims in issue invalid in view of the prior art, claim 1 of the 131 patent also invalid for double patenting, and none of the claims infringed.

The testimony of the defendant's expert witness, whom the court below found clear, credible and skilled and upon whom it relied, provides ample evidentiary support for this finding. But plaintiff's counsel contends that no question of this witness's credibility is involved because his testimony is demonstrably mistaken, wherefore the findings based thereon are "clearly erroneous."

Resolution of this contention takes us into the construction and operation of generators and motors in general and then leads on into technical details many of which we find beyond our comprehension, for the plaintiff's patents are not only voluminous but are couched in a technical vocabulary with which we are wholly unfamiliar. We frankly admit that we cannot read them intelligently. We quote claim 10 of the 098 patent in

the margin to illustrate our difficulty.[3] Moreover, we have great difficulty in understanding, even in a general way, the technical testimony of the experts and the discussion of that testimony by counsel orally and in their briefs. However, we must do the best we can.

Generators and motors are structurally very similar. Both operate by systems of electro-magnets and both have two main components, a stator, which is a stationary part and a rotor, which is a rotating part. All such machines have a field member and an armature, either one of which may be the rotor while the other is then the stator. For present purposes the rotor will be deemed the field member.

All rotating electric machines are provided with a pre-determined number of electro-magnetic poles arranged alternately north and south, or positive and negative, around the periphery of the rotor. The number of pole pairs determines the speed of the machine, be it a generator or a motor. We see no need to elaborate further on this feature of electric generators and motors. The stators of these machines, regarded as the armatures, consist of electro-magnets equiangularly spaced around the periphery facing the magnets of the rotor. These magnets are separated by apertures called slots in which are disposed electric conductors in the form of wires. The movement of the rotor field winding electro-magnetically induces voltages in these conductors and these voltages are the output electricity of the generator.

The total slots in the stator of the machine covered by the 098 patent are divided into "collections" or "sets" and the number of slots per "collection" differs from the number of rotor poles per "collection" by one. No specific number of slots is specified in the patent. Nyyssonen's primary example is 9 slots and 8 poles but his patent is general enough to cover any number. While "collections" or "sets," sometimes called "repeatable groups," of slots are identical,[4] the number of conductors or wires in each slot of each group is not, but varies from one slot to the next. The court below found, and as we understand the case, the gist of Nyyssonen's patents lies in the numbers of conductors in each slot and in their inter-connection called the conductor distribution.

Nyyssonen's conductor distribution is called a "sine distribution" which means that the number of conductors in any one

3. A synchronous machine having, in combination, stator and rotor elements, one of the elements having a magnetizable core provided with an assembly, stationary with respect to the said one element, of substantially equiangularly spaced slots comprising one or more collections each of substantially the same number of slots, a polyphase winding comprising a plurality of phase windings each having a number of conductor groups substantially equal to the number of slots, a conductor group of each phase winding being disposed substantially in each slot, the numbers of conductors of the conductor groups of each phase winding varying substantially as the absolute values of the sine over a total range substantially equal to 180 degrees multiplied by the number of collections of slots at angular increments each substantially equal to the said total range divided by the number of slots, the respective total ranges being displaced with respect to one another an angular amount substantially equal to the phase displacement of the phase windings, the directions of winding of the conductors of the conductor groups of each phase winding changing alternately with, and with the negative of, the sign of the said sine, the conductor groups of the respective phase windings being connected in series along the said directions of winding, and the other element having means for producing a magnetic field, stationary with respect to the said other element, of substantially equiangularly spaced poles of alternately opposite polarity equal in number to the number of slots plus or minus the number of collections of slots.

4. We are not impressed by the appellant's argument that this is not so because patent 098 is not limited to the same number of stator slots in each collection. All he seems to have in support of his contention is lack of specific language in the patent and Fig. 22 showing collections the mirror images of one another. Anyway we do not consider resolution of this dispute dispositive of the case.

slot for one phase winding is in proportion to the trigonometric sine function of an angle associated with the particular slot called in the patent the "phase-sequence angle."[5] The basic bone of contention on the issue of validity is whether the sine distribution was new with Nyyssonen, the court below held it was not, and whether the defendant used that distribution in its accused devices or used instead an earlier distinctly different one called the Glass distribution, as the court below held.

Solution of this issue requires discussion of the accused machines which are not synchronous machines but synchros regarded by the plaintiff's expert as a sub-class of synchronous machines but by the defendant's expert as in a separate category. Synchros like synchronous machines consist of a stator and a rotor but they are not designed or intended, although they might perhaps be used, for synchronous continuous rotary motion. Synchros are remote positioning devices designed for the transmission of angular values to a distance by electricity, either through wires or by radio.

A synchro system consists of two snychros, a transmitter and a receiver. When such a system is electrically energized the rotor of the receiver will align itself with respect to its stator with the alignment of the rotor of the transmitter with respect to its stator. Thereafter when the rotor of the transmitter is turned the rotor of the receiver will move in the same direction to the same extent. They are used among other places on submarines to indicate deviation of the vessel from its level. A gyro on a submarine tells which way is "up." When the vessel tilts, its angle with respect to "up" changes. Thus if a gyro is appro-priately attached to the rotor of a transmitter synchro, the rotor will be moved with the vessel's tilt and an electrically connected receiver synchro in an indicator will show the direction and extent of the tilt.

The conductors in the slots of the stators of the accused devices vary in number from slot to slot as in Nyyssonen. But the defendant contends that it does not use a sine distribution but a Glass distribution, that is to say, a distribution based upon the disclosure of patent No. 2,488,771 issued to its assignor and research man, John P. Glass, Jr., in 1949 on a 1944 application for "Induction Devices Having a Substantially Pure Sine Relation Between the Coupling and the Relative Displacement of Its Elements." The plaintiff concedes, as he must to escape anticipation, that the defendant indeed originally used a Glass distribution which was not Nyyssonen's distribution. But he contends that after Nyyssonen showed his patent to the defendant it changed its devices to his distribution, indeed, brazenly pirated his invention. The defendant admits its change of design. But it asserts that its change was not to Nyyssonen's distribution and owed nothing whatever to his teaching but resulted entirely from its independent research in developing the Glass distribution in the light of the prior art. The plaintiff admits that the defendant indeed used the old Glass techniques in its new accused synchros but he asserts that it uses his novel sine distribution in them as well.

The Glass distribution and the sine distribution are similar in some respects but differ in others. The opposing expert witnesses disagree as to their similarities and differences. We frankly admit that we cannot understand the differ-

5. Additionally the patent describes an alternate opposite direction of winding of the conductor groups of each phase winding. This means that when the slots are arranged in a particular sequence the current in the conductors is in one direction in one slot and in the opposite direction in the next slot of the sequence.

However, the court below, clearly on adequate evidence, found alternately opposite direction of winding to be inherent in all synchronous machines and not a distinguishing characteristic of Nyyssonen. We need give this feature no further consideration.

ence between the two types of distribution well enough to say with any assurance which expert was correct.

■ One basic contention of counsel for the plaintiff-appellant with respect to infringement, however, we at least think we understand. Wherefore we decide this case on that issue alone.[6] This is his assertion that the defendant infringes because it uses in the rotor of its accused machines a "stationary magnetic field" new to the art with Nyyssonen.

We start with consideration of the meaning in Nyyssonen's patents of a "stationary magnetic field." This is necessary because magnetic fields may be either stationary in time or stationary in space with reference to a magnet. (Of course, if a magnet is physically moved its field, i. e., the space near the magnet in which its magnetic forces are sensible, will of necessity move with it.) A magnetic field is stationary in time when its polarity does not change, as is the case with a permanent magnet or an electromagnet energized by a direct current of electricity. In such magnets the north pole is always the north pole and the south pole is always the south pole. An electro-magnet energized by an alternating current of electricity, however, changes its polarity with the frequency of the current. Its field, therefore, is not stationary but alternating in time.

The magnets in the rotor of Nyyssonen's machines are activated by direct current and so their magnetic fields are stationary in time as well as, necessarily, stationary in space with respect to their magnets. The magnets in the rotors of the defendant's accused devices, however, are activated by alternating current. Wherefore their fields are not stationary in time, although, of course, their fields are stationary with reference to their magnets as in Nyyssonen and everywhere else. There being no doubt that Nyyssonen activated the mag-

nets in his rotor by direct current and there being equally no doubt that the defendant activated the magnets in its rotors by alternating current, claim 10 of the 098 patent can be made to read on the accused devices only if "stationary" means space, not time. Indeed, the plaintiff's expert made it clear that stationary had to read in a spatial sense to make claim 10 read on the defendant's synchros.

The defendant's expert, however, took the view that "stationary" in the Nyyssonen patents referred to time insofar as the magnets in the rotors of his devices were concerned. He testified:

"Q. Does the Nyyssonen machine as described in the Nyyssonen patent have a stationary field for the rotor?

"A. It has a stationary field with respect to the rotor.

\*    \*    \*    \*    \*    \*

"Q. Do the accused structures have a stationary field?

"A. The accused structures do not have a stationary field with respect to the rotor.

"Q. In what sense is the field of the accused structures not stationary?

"A. It is alternating."

The court below took the defendant's expert witness' view of the patent. It found that claim 10 of the 098 patent did not read on the accused synchros because: "The rotor field is not stationary, but varies by alternating. As used in the Nyyssonen patent 'stationary' means a direct current excited field, absent from the accused synchros." Thus the issue turns upon whether "stationary" as used in the patents means stationary in time or stationary in space.

■ In resolving this issue the court below relied upon the defendant's expert witness. This was quite proper, for a patent speaks to its art and what

6. The court below found: "The windings of the accused machines are different from Nyyssonen's, function differently from Nyyssonen's, and any similarity in result is produced in a different way."

it says can be told in complicated cases like this only by one skilled in the art. In B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 122 F.2d 900, 908 (C.A. 1, 1941), cert. denied, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219 (1942), this court held that an expert witness might testify that a patented invention was not disclosed in the prior art. By the same token we think an admitted expert may say what a complicated patent covers and discloses to its art. The question is the credibility of the witness and that primarily is for the trial court under Rule 52(a). Indeed, as the Court pointed out in Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 274, 69 S.Ct. 535, 537, 93 L.Ed. 672 (1949), to no type of case is the admonition to give due regard to the opportunity of the trial court to judge the credibility of witnesses more appropriately applicable than to cases like the present " * * * where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations." We think the trial court's interpretation of the patent in the respect under consideration is clearly correct and from this it follows that the conclusion of non-infringement is also correct.

So far we have only mentioned but not considered claim 1 of the 131 patent for a Polyphase Transformer System, a device which has no moving parts. This is because the parties have laid little stress on this claim apparently being almost in agreement that it stands or falls with claim 10 of the 098 patent. Plaintiff's counsel, however, contends that it is possible to find claim 1 infringed "if this court should hold [as we do] that the magnetic field of the rotor of the accused multipolar synchro is not stationary, because it is alternating." Without more illumination than we get from the plaintiff's brief we cannot pass intelligently on this assertion. We need not invite further brief and argument, however, even if we should be disposed to allow plaintiff's counsel another bite at the cherry when his brief is 147 pages and his reply brief adds 25 pages, because we think it clear that claim 1 is invalid for double patenting over claim 10 of the 098 patent by merely using the word "circuits" in place of the word "slots."

In deciding this appeal only on the issue of infringement we are not unmindful of the desirability of disposing of patents as a whole to the end that invalid patents "should not remain in the art as a scarecrow," to quote the late Judge Learned Hand in Bresnick v. United States Vitamin Corp., 139 F.2d 239, 242 (C.A.2, 1943). See this court's discussion in Hale v. General Motors Corp., 147 F.2d 383, 388 (C.A.1, 1945). The reason for our limiting our consideration to the issue of infringement in this case is that we cannot say with any assurance that Nyyssonen's patents are indeed invalid and we think it would be unwise in this situation to run the risk of mistaking a scarecrow for a farmer leaning on his hoe, to carry on Judge Hand's picturesque simile.

This, however, does not imply any criticism whatever of the court below for deciding both validity and infringement. The court below took the proper course to avoid remand and perhaps retrial, should its decision of but one of the issues be reversed on appeal.

The disposition we make of this appeal renders unnecessary any consideration of the appellant's other contentions. His appeals from the denial of his motions under Rules 52(b) and 59(a) relate to the issue of validity.

Judgment will be entered affirming the judgment of the District Court insofar as it rests upon the issue of infringement.