W. J. USERY, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS, INTERNATIONAL MARITIME DIVISION, ILA, AFL–CIO, Defendant-Appellant.

No. 1209, Docket 76–6076.

United States Court of Appeals, Second Circuit.

Argued June 18, 1976.

Decided July 12, 1976.

Marvin Schwartz, New York City (Burton M. Epstein, New York City, of counsel), for defendant-appellant.

Dennison Young, Jr., Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., and Stuart I. Parker and Frederick P. Schaffer, Asst. U. S. Attys., S. D. N. Y., and Francis V. LaRuffa, Regional Sol., New York City, Rudolph E. DeMeo, Atty., Dept. of Labor, of counsel), for plaintiff-appellee.

Before MANSFIELD, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal from a summary judgment by the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge*, ordering the defendant International Organization of Masters, Mates & Pilots ("the Union") to conduct a new election for its three International officers and all of its Offshore Division officers, under the supervision of the Secretary of Labor ("the Secretary") to be completed no later than the end of 1976.

The action was filed by the Secretary on November 28, 1972 to declare void the Union election that had been held by mail ballots between September 21, 1971 and December 22, 1971 ("the 1971 election"). The action was brought under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481 *et seq.* Jurisdiction is conferred by Section 402(b) of the Act, 29 U.S.C. § 482(b).

Though the action was filed in November 1972, the motion for summary judgment to void the 1971 election was not made by the plaintiff until December 17, 1974, returnable on January 2, 1975. The decision to grant summary judgment was not filed until March 17, 1976 and judgment was entered on April 15, 1976.

In the meantime, while the action was pending, two significant events occurred. The time for another regular election pursuant to the Union constitution arrived and it was held by mail balloting between September 1974 and January 1975 under the supervision of the American Arbitration Association ("AAA").[1]

The other event was the action of this court in sustaining a complaint in the Southern District of New York by Union members seeking an injunction to prevent the new Union constitution adopted in 1970 from becoming effective. See *Sheldon v. O'Callaghan,* 497 F.2d 1276 (2 Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974). The case was remanded to the District Court for further proceedings and Judge Knapp ordered a new referendum on the 1970 constitution to be completed by February 26, 1977 until which time the present constitution remains in force. We discuss the significance of the validity of the 1970 constitution below.

The history of the elections and ensuing controversies may be stated briefly.

In the 1974 Presidential and Vice-Presidential races, no candidate received the 40% plurality prescribed by the constitution as the minimum vote necessary for outright victory. Accordingly, a run-off election was held for the top positions which extended the election until June 1975. The incumbent President (O'Callaghan), the beneficiary of the challenged 1971 Newsletter, was defeated in the 1975 run-off.

---

1. The Union has about 10,000 members residing all over the United States, most of whom are deck officers serving the American merchant marine. At any given time a large proportion of the membership is serving aboard ship. Under the Union constitution, accordingly, elections are held every three years by mail ballots. Nominations begin in June of an election year and there is a ninety-day balloting period ending in December of that year.

From September to December 1971, the Union, pursuant to its constitution, conducted an election for officers of the International Union. During roughly the same period (from August to November 1971), a referendum was conducted on the question of whether the Union should affiliate with the International Longshoremen's Association ("ILA"). In connection with this referendum, on August 19, 1971, a Newsletter was mailed to all of the members of the Union. This Newsletter contained certain remarks by Thomas Gleason, President of the ILA, which strongly praised O'Callaghan, the incumbent president of the Union, who was running for re-election, and strongly criticized Sheldon, an opposing candidate for president who strongly opposed the proposed affiliation with the ILA. Based on the mailing of this Newsletter, the distribution of which was alleged to violate 29 U.S.C. § 481, Sheldon and two other candidates brought an action alleging the illegality of the distribution of the Newsletter and requesting that the ballots for the forthcoming election not be mailed. Although the specific Newsletter involved related directly not to the election but rather to the referendum, it was alleged by the Sheldon plaintiffs that the statements regarding the candidates for office contained in this Newsletter were such as to affect the fairness of the election.

Judge Croake refused to issue a preliminary injunction of the balloting but ordered the Union to distribute at its own expense the campaign literature prepared by the plaintiffs. Pursuant to Judge Croake's order and shortly before November 9, 1971, Sheldon, the competing nominee for President, submitted his literature to the AAA. The AAA mailed the literature shortly after November 9, 1971, but by that time 3,000 to 4,000 ballots had already been cast and returned, without benefit of the Sheldon literature. Judge Motley subsequently held, in granting summary judgment, that "the voting which took place before November 9 was clearly of such magnitude that the results of the entire election could have hinged on the effect of the Newsletter on this pre-remedy balloting." (Opinion of Judge Motley at 27).

The relevant statute, 29 U.S.C. § 481(g), provides that no moneys received by any labor organization "shall be contributed or applied to promote the candidacy of any person in an election" of union officers.[2] Furthermore, § 481(c) provides that every labor organization must "comply with all reasonable requests of any candidate to distribute" campaign literature to all members of the Union "and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members. . . ." The statute further provides that whenever any mailing is made by the Union on behalf of any candidate, similar distribution of campaign literature must be made at the request of any other *bona fide* candidate.[3]

**2.** Section 481(g) reads in full:

No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

**3.** Section 481(c) reads:

Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every

The Union constitution provides for elections every three years. Before the Secretary had moved for summary judgment, the balloting for the 1974 officers election was well underway. The fairness of the 1974 election procedure is conceded by the Secretary.[4] As a result of the 1974 election, two of the three international officer incumbents (including O'Callaghan) were defeated, as were close to two-thirds of the local incumbent officers.

The appellant argues that the judgment and order should be vacated and the case dismissed on the merits or as moot; alternatively, it argues that if a supervised election is required, it should be held at the time of the next regular triennial election commencing June 1977.

■ We agree with the District Court that because of the timing of its distribution during an election campaign, the Newsletter laudatory of the incumbent President and derogatory of his opponent paid for by the Union and distributed from its mailing list was prohibited campaign literature in violation of Section 481(g). See *Hodgson v. Liquor Salesmen's Union Local No. 2*, 334 F.Supp. 1369, 1377 (S.D.N.Y.), aff'd, 444 F.2d 1344 (2 Cir. 1971); *Wirtz v. Independent Workers Union of Florida*, 272 F.Supp. 31 (M.D.Fla.1967). The finding that the Union failed to offer "similar distribution at the request of [an] other bona

fide candidate" compels the conclusion that there was also a violation of Section 481(c).

■ In finding that 3,000 to 4,000 votes had already been cast before the counter-mailing ordered by Judge Croake was effected, the District Court properly held that a *prima facie* case had been made out that the violation may have affected the outcome of the election, *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 506–07, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), and that it was impossible for the Union to prove that the violation did not affect the outcome. See *Hodgson v. Liquor Salesmen's Union, supra* ; *Brennan v. Local Union No. 639, Intl. Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 161 U.S.App.D.C. 173, 494 F.2d 1092, 1097–98 (1974). In granting summary judgment, Judge Motley found that in every Port there had been ballots cast by November 9, 1971 potentially sufficient to have changed the result in all contests of the disputed election.[5]

The Union contends, however, that even if the 1971 election was unlawful, the action brought by the Secretary was mooted when the regularly scheduled election of 1974 resulted in the defeat of the winner of the 1971 election. Since the result of the election of 1974 mooted the action, the Union concludes, the judgment below should be vacated.

---

bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

4. The Secretary has challenged the 1974 election in a separate action directed only against the Offshore Division and only with respect to the provisions of the constitution relating to the election of Offshore Division officers. *Dunlop v. IOMM&P, Int'l Marine Division ILA*,

*AFL–CIO Offshore Division*, No. 75 Civ. 2095 (S.D.N.Y., filed May 2, 1975).

5. Section 402 of the Act, 29 U.S.C. § 482(c) provides that:

"If, upon a preponderance of the evidence *after a trial upon the merits*, the court finds—

". . . that the violation of section 481 of this title may have affected the outcome of an election,

"the court shall declare the election, if any, to be void and direct the conduct of a new election under [the] supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." (Emphasis added)

The language is not to be read literally and summary judgment lies in a proper case. *Brennan v. Local Union No. 639, supra*, 494 F.2d at 1094–98.

The Secretary, on the contrary, takes the extreme position that the 1974 election is not to be considered at all in reviewing this action with respect to the 1971 election. Both sides have argued that the question is whether the action was rendered moot by the 1974 election. The District Court apparently accepted the Secretary's argument and felt compelled to order a supervised election before the end of 1976 as requested by the Secretary. We cannot agree.

The Secretary relies on *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968), as holding that the supervening election must be disregarded in determining his right to insist on a supervised election. We think that the *Glass Blowers* case does not have that reach, and that there are two distinct questions before us: first, whether the case is mooted by the intervening election and second, if it is not, what is the proper remedy.

In *Glass Blowers* the Secretary had brought an action challenging an eligibility requirement for local office—attendance at a certain number of meetings—that disqualified a large proportion of the union's membership, and seeking to have the 1963 election declared void. While the action was pending, a regular election was held in 1965 under the same eligibility requirements. See *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 372 F.2d 86, 88 (3 Cir. 1966) (opinion below).

The Court of Appeals held that the new election of 1965, concerning which no complaint had been made, rendered moot the Secretary's attack on the earlier election of 1963. The Supreme Court reversed. It held that when the Secretary of Labor proves the existence of a § 401 violation that may have affected the outcome of a challenged election, the fact that the Union had already conducted another unsupervised election does not deprive the Secretary of his right to a court order declaring the challenged election void and directing that a new election be conducted under his supervision.

■ Appellant invites us, nevertheless, to hold the present action moot because of the different circumstances here involved. We think that, in the light of the *Glass Blowers* opinion, the supervening unsupervised election *per se* did not render the Secretary's pending action moot, and hence deprive the court of jurisdiction. See *Local No. 8–6, Oil, Chemical & Atomic Workers Internat'l Union, AFL–CIO v. Missouri*, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960); *St. Pierre v. United States*, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943).[6] On the other hand, the *Glass Blowers* opinion did not concern itself with the question of remedy except in general terms. The Court simply held that the Secretary has a right to a court order which directs that a new election be conducted under his supervision, and that a second election does not oust the court of jurisdiction over the original action. Recognizing that Judge Motley had jurisdiction, we cannot vacate the judgment and dismiss the action.

But as we learned in *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944),

"The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

■ We turn, therefore, to "the practicality" of the situation and whether equity

---

**6.** It is true that the Court was concerned with a supervening election in which the incumbents were returned to office under the same challenged electoral requirements, and that the Court emphasized the "perpetuation of control" by the incumbents as a factor in its decision. We recognize, nevertheless, that the Court did not limit its holding with regard to mootness to elections in which incumbents were the victors. *Cf. Brennan v. Local 3489, United Steelworkers of America, AFL–CIO*, 520 F.2d 516, 518 n. 3 (7 Cir. 1975), *cert. granted*, 424 U.S. 907, 96 S.Ct. 1100, 47 L.Ed.2d 311 (1976).

commands a remedy different from that ordered by the District Court. We have concluded that, in the circumstances, the action of the Secretary in demanding a 1976 election was arbitrary, and that the acquiescence by the court in the Secretary's demand cannot be sustained. See *Brennan v. Local 551, United Automobile, Aerospace & Agricultural Implement Workers of America, Inc.*, 486 F.2d 6, 7–8 (7 Cir. 1973) (Circuit Judge Stevens) (while the Secretary has power "in the first instance" to set the date of a supervised election, proof that such decision is "arbitrary or unreasonable" will justify judicial modification). We accordingly review the circumstances that lead us to the conclusion that the proper remedy is to order an election to be held before the end of 1977 under the supervision of the Secretary.

The persons now holding office were elected without electoral taint. The international level incumbents who benefitted from the unlawful 1971 election were, with the exception of the secretary-treasurer, defeated in the 1974 election supervised by the AAA. The election in *Glass Blowers* had the taint of ineligible voting requirements while here the vice was a single incident involving the distribution of unlawful literature. The Secretary failed to make his motion for summary judgment before the regular election of 1974, thus permitting the incumbent, O'Callaghan, if he had won, to have continued in office until final judgment. We think the public policy implicit in the Act is ill-served when court actions by the Secretary are allowed to drag on interminably while the target of the attack remains in office.[7] See *Bottle Blowers, supra,* 389 U.S. at 468 n. 7, 88 S.Ct. 643. Nor should we be unmindful of the statutory admonition that "[n]o labor organization shall be required by law to conduct elections of officers with greater fre-

quency or in a different form or manner than is required by its own constitution or bylaws, except as otherwise provided by this subchapter." 29 U.S.C. § 483. *Cf. Wirtz v. Local Unions 410, 410A, 410B & 410C, Internat'l Union of Operating Engineers,* 366 F.2d 438, 442 (2 Cir. 1966).

We are concerned, moreover, with the question of possibly unnecessary expense to the Union members.[8] *Cf. Wirtz v. Local Union 169, Internat'l Hod Carriers, Building & Common Laborers' Union of America, AFL–CIO,* 246 F.Supp. 741, 754 (D.Nev. 1965). The validity of the constitution purportedly adopted in 1970 and subsequently held to have been improperly ratified, *Sheldon v. O'Callaghan, supra,* will be the subject of a referendum before February 1977. If the constitution should not be ratified, Judge Knapp has ordered that a constitutional convention be convened. The issue of the Union constitution may be settled by the second half of 1977. If the election is held prematurely, changes in the constitution may require a new election.

There is, moreover, an electoral problem in the Secretary's lawsuit which the District Court failed to resolve on the motion for summary judgment and which is possibly soluble before a 1977 election, though not before a 1976 election. This concerns the election of officers of the Offshore Division. See note 4, *supra.* In the action before Judge Motley, the Secretary contended that members of the Offshore Division of the Union were denied the right to nominate candidates or to be candidates for the office of the Offshore Division Vice-President (Atlantic) and Offshore Division Vice-President (Gulf). Provisions of the International Constitution and the Offshore Division By-Laws do not permit a direct vote by Offshore Division members for Offshore Division Vice Presidential positions. The Port

7. The statute provides that if the Secretary initiates an action the election is presumed valid until the court has adjudged it invalid. 29 U.S.C. § 482(a). The incumbent therefore remains in office during the pendency of the Secretary's challenge of the election in the courts.

8. The record indicates that the costs for the various items involved in the 1974–75 election amounted to $262,846.28. These included printing, Ballot Committee expense, fees to the AAA for the election and run-off election, cost of transcripts and fees for counsel to the Ballot Committee.

Agents for the Port of New York and the Port of Galveston, who are elected only by members in each Port, respectively, become *ipso facto* Vice-Presidents of the Atlantic and Gulf Divisions. Members of other Ports in the Atlantic and Gulf Divisions have no voice in who becomes Vice-President of those Divisions. The Secretary maintains that these provisions are in violation of 29 U.S.C. § 481(e).[9] The Union contends otherwise.

The positions of Offshore Vice-Presidents will be filled in whatever election is ordered. The Secretary asserts that in a supervised election he has the power unilaterally to void the disputed provisions. If the supervised election is not held until the latter part of 1977, there may be time for a final judicial decision on the validity of these provisions. It would be expensive and wasteful to require an election under a rule which is now subject to challenge, and which later may be resolved by judicial decision before a 1977 election.[10]

The combination of all these circumstances compels the conclusion that the order for a new election in 1976 was improvident in the circumstances and not compelled by the language of the statute. See *Hecht v. Bowles, supra.* A new election under the supervision of the Secretary to be held in 1977 would be "lawful and practicable, in conformity with the constitution and by-laws of the labor organization." 29 U.S.C. § 482(c). The court is not limited in a § 482(b) case to consideration of remedies proposed by the Secretary. See *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 537, n. 8, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).[11]

We accordingly direct that the judgment be modified to order the election to be supervised by the Secretary of the regular time for holding an election in 1977. See *United States v. Crescent Amusement Co.,* 323 U.S. 173, 185, 65 S.Ct. 254, 89 L.Ed. 160 (1944). The judgment is otherwise affirmed.

9. Section 481(e) provides:

   In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all

other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

10. We are informed that since the oral argument of this appeal Judge Motley has decided that the section of the Union constitution which provides that officers of the International Division become officers of the Offshore Division is illegal, but we have seen no written order. We assume that, if an appeal is taken by the Union, it probably cannot be disposed of finally before ballots are made up for a 1976 election.

11. The Secretary asserts that his authority to decide when to hold the supervised election is unreviewable. We do not agree. Even the fundamental question of whether the Secretary should institute an action under § 482(b) of the Act is subject to some judicial review. *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). Moreover, instead of submitting a proposed judgment leaving the time of the election to the discretion of the Secretary, he submitted a proposed judgment in which he permitted the court to fix the time for the election in the judgment. It is this judgment which is on appeal.